UNITED STATES, Appellee

v.

JOHN E. DAY, JR., Private E–2, U. S. Army, Appellant

2 USCMA 416, 9 CMR 46

417

418

No. 703

Decided April 30, 1953

Burr Tracy Ansell, Esq., LT. COL. James C. Hamilton, U. S. Army, and 1ST LT. Levin H. Campbell, III, U. S. Army, for Appellant.

LT. COL. Thayer Chapman, U. S. Army, 1ST LT. Eugene L. Grimm, U. S. Army, and 1ST LT. Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case is before the Court pursuant to Article 67 (b) (1), Uniform Code of Military Justice, 50 USC § 654, requiring that we review all cases in which the sentence, as affirmed by the Board of Review, imposes the death penalty.

420

## I

On the night of December 23, 1950, Lee Hak Chun, the victim of the shooting, his wife, Kim Chung Hi, and their three children, were in a basement room of the "VIP billets" in the Eighth Army Officer's Building in Seoul, awaiting transportation to Taegu the next morning. There were five or six Korean men in the adjoining basement room. About midnight the accused, fully dressed and unarmed, came into the room where Kim and Lee were waiting. He sat down beside Kim and put out the lights. Shortly after, he turned on the lights and seized Kim by her throat. When some undisclosed person succeeded in taking Kim away from the accused, he struck Lee in the mouth. Accused then left the room, but returned a short time later clad only in a pair of shorts and an undershirt. He was carrying a gun and was accompanied by an interpreter. The interpreter asked Lee "who are they?" and he replied, "they are my family, and I am trying to get transportation for them to leave for Taegu." The accused then demanded that Kim be "conceded" to him. The interpreter then said to Lee, "If you don't send this woman to upstairs, the soldier will kill all of you." Immediately following that statement, all of the people in the basement, which now included the men from the adjoining room, were directed by accused to line up. The interpreter then told Lee to step out of line, and when he did so, the accused fired two or three rounds from his carbine, each slug hitting Lee. One or more of the slugs were fatal as Lee died shortly thereafter.

After the shooting the accused took Kim outside the house, and touched her body with his private parts. She screamed, and he struck her on the head with the butt of his gun. The accused again took additional liberties with Kim. She had been carrying a baby on her back, and accused threw it on a nearby truck. He then tried to force Kim to climb in the truck. Shortly thereafter an American soldier appeared on the scene, the accused released Kim, and she ran back into the basement.

After about twenty minutes the military police arrived. They found the accused in his room, and noted that his gun had been recently fired. Several of the Korean men in the basement and Kim identified the accused as the man who was responsible for the killing, although Kim was not too certain of her identification at the time of the trial. There was some evidence introduced to establish that the accused had been drinking heavily that day, and had acted strangely, although Kim and some of the Korean men were not positive in their assertions that he had done so. Shortly after the incident, the accused voluntarily gave a statement about his version of the killing; and in connection with intoxication, stated only that he had been drinking at that time.

Accused was tried on three charges. Charge I involved a violation of the 92d Article of War, 10 USC § 1564, charging the murder of Lee Hak Chun. Charge II involved a violation of the 93d Article of War, 10 USC § 1565, charging assault with a deadly weapon with intent to do great bodily harm. Charge III was a violation of Article of War 96, 10 USC § 1568, alleging an indecent assault. He was found guilty of the first and second charge, but acquitted of the third. The court-martial imposed the death penalty. The convening authority approved the findings and sentence and the Board of Review affirmed.

## II

Appellate defense counsel have advanced the following assignments of error: (1) insufficient instructions, (2) introduction of irrelevant and improper evidence and argument as to the death of Kim Chung Hi's baby, (3) admission of extrajudicial statement when the maker was able to remember part of the contents of the statement, (4) impeachment by prosecution of its own witness, (5) admission into evidence of testimony attributed to the accused, but made by an interpreter, and (6) denial of due process to the accused, due to incompetent defense counsel.

Because this is a mandatory appeal, we shall consider all assignments in the order mentioned.

## III

In the first assignment of error we dispose of one possible error on the murder charge not pressed on us by counsel. In order to assist the reader in evaluating our disposal of the assignment of error, as augmented, we deem it necessary to set forth the instructions given by the law officer to the court:

"The court is advised that the elements of the offenses charged are as follows: a. As to Charge I:

(1) That the accused unlawfully killed a certain person named by certain means, as alleged;

(2) That the victim is dead;

(3) That the death resulted from an injury received by the victim;

(4) That such injury resulted from an act of the accused;

(5) That death occurred within a year and a day of such act;

(6) That such killing was with malice aforethought; and,

(7) That the killing was premeditated.

"The court is referred to paragraph 179a, pages 230–232, Manual for Courts-Martial 1949, for a discussion of the offense of murder and the meaning of the terms 'malice aforethought' and 'premeditation'. Among the lesser included offenses of premeditated murder are unpremeditated murder, voluntary and involuntary manslaughter, attempt to commit murder and certain forms of assault."

The first infirmity noticed in this charge arises out of the law officer's reference to the Courts-Martial Manual for a definition of "malice aforethought" and "premeditation" and in his not giving a definition of these words.

This Court has repeatedly held that it is the duty of the law officer to instruct the court on the elements of the crime with which he is charged. United States v. Lucas (No. 7), 1 CMR 19, decided November 8, 1951; United States v. Clay (No. 49), 1 CMR 74, decided November 27, 1951; United States v. Rhoden (No. 153), 2 CMR 99, de-

**422**

cided February 26, 1952; United States v. Clark (No. 190), 2 CMR 107, decided February 29, 1952. In this case it could not be seriously contended that the law officer did not instruct the court on those elements for he set forth all the requisites that must be found by the court-martial before the accused could be found guilty of premeditated murder. Counsel for accused does not contend otherwise. The question, therefore, narrows itself to one of whether it was error for the law officer not to go further, without a request, and define the terms "malice aforethought," and "premeditation."

While be believe it desirable that law officers when instructing on the offense of murder give definitions of the terms "malice aforethought" and "premeditation," we do not believe the failure to do so is fatal to a finding in this case. They are not words which are known only to lawyers or members of the legal profession. They are words of general usage and while officers might understand them slightly different from their legal definition, the difference is unimportant in that it does not lessen the burden of proof placed on the Government. Malice aforethought is usually understood to mean thought out beforehand with a malignant heart and premeditation would be interpreted as planning beforehand. It may be that a slight variation in application of the terms might arise under some factual situations which might make their definitions necessary, but they are not present in this case. We believe there must be some burden borne by defense counsel and if terms are used which might require some amplification, there is a duty on defense counsel to request further instructions. Trial counsel, defense counsel and the law officer are present for the purpose of assisting in the proper presentation of the cause and each should assume some responsibility to assure that all issues are fairly litigated. Defense counsel can not sit by, do nothing to assist his client, and then have this Court reverse because of his delict. The sooner defense counsel defend properly the rights of the accused, the sooner will we have good administration. In this connec-

tion, we have previously held that if the law officer instructs properly on the elements of the offenses in issue and counsel for an accused believes that explanatory or definitive instructions are needed to clarify the charge, he should make appropriate requests. Certainly, unless we find good reason to believe that a miscarriage of law has resulted, we are not disposed to permit this type of assignment to be raised for the first time on appeal.

To allay any fears that prejudice resulted in this case from the lack of definitions of the terms, we call attention to the fact that the court was not uninformed. Both counsel in their arguments gave the court accurate definitions. They read from the Manual and the law officer gave the court members the particular paragraphs from which defense counsel read. This is the manner in which the matter was treated. The prosecution quoted a definition of premeditation from Black's Law Dictionary, which stated:

"To think of an act beforehand; to contrive and design; to plot or lay plans for the execution of a purpose."

He then went on to quote another definition from the same volume:

"The act of meditating in advance; the deliberation upon a contemplated act; plotting or contriving; a design formed to do something before it is done."

Only moments later defense counsel read from paragraph 179a in the 1949 Manual. This is what he read to the court-martial:

". . . A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intention to kill someone and consideration of the act intended. Premeditation imports substantial, although brief, deliberation or design. For example, if in the course of an attempt to rape, the assailant deliberately chokes his victim until she suffocates, the deliberate nature of his act reveals premedita-

tion, even though he may have entered upon the attempt intending no other harm. But if, in attempting to run from her assailant, the victim falls from a cliff and is killed, premeditation is lacking. . . ."

IV

The principal complaint lodged against the instructions by appellate defense counsel is the failure of the law officer to instruct on the leseer included offenses of premeditated murder. The only included offenses of premeditated murder which need to be mentioned are voluntary or involuntary manslaughter, negligent homicide, and unpremeditated murder. That the first three are not reasonably raised by the evidence is obvious from our recitation of facts. There is not even a trace of evidence that the killing was occasioned by any degree of negligence, and the record is barren of any hint of justification or excuse for the killing. The only instruction needed then was on unpremeditated murder. We think there was, for all practical purposes, such an instruction given.

We have pointed out that the court members were fully informed on the elements of premeditated murder. The only difference between the crime of premeditated murder and unpremeditated murder is the element of premeditation. If this element was found, the accused is guilty of the greater crime; if it was not found, he was guilty of the lesser. As a matter of fact, the only difference between the elements of the two degrees of murder can be determined solely from the names given the two crimes. The question is, however, was the court-martial aware of the difference and did the members know they could return a verdict of guilty of the lesser offense?

If there was any reason for the offense of unpremeditated murder being in issue, it was because of the fact that there was some testimony that accused had been drinking. The law officer recognized the possibility of drunkenness affecting mental capacity and he, therefore, gave the following instruction:

**423**

"The court is further referred to paragraph 154, subparagraph (2), Manual for Courts-Martial 1951, for a discussion of voluntary drunkenness as affects intent. I quote: .

'A temporary loss of reason which accompanies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity, in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; *but such drunkenness may be considered as affecting mental capacity to entertain a specific intent, or to premeditate a design to kill, when either matter is a necessary element of the offense.*'" [Emphasis supplied]

This instruction was preceded by one which told the court members that unpremeditated murder was an included offense of premeditated murder. They were further instructed that if they had a reasonable doubt as to the degree of the crime, the finding must be in a lower degree as to which there was no doubt. The instructions must be interpreted as a whole and when this is done we fail to see how, or in what way, the court-martial was misled, confused or under-instructed. While the legal concepts may not have been spelled out with the niceties sometimes found in civilian cases, we are satisfied the instructions were of sufficient completeness and clarity that any reasonable man would be able to ascertain, with little difficulty, the elements making up the two respective offenses. Perhaps a good test can be found in the clarity with which counsel presented the principles to the court-martial. A quick look at the arguments will establish with conviction the premise that all parties at the trial level understood the rule that intoxication could be used as a defense to premeditation or specific intent to kill to the extent that the crime charged could be reduced to murder unpremeditated.

**424**

V

Although there was no error assigned by counsel for the accused with respect to Charge II, there is error present. The charge against the accused was "Assault with a deadly weapon, with intent to do great bodily harm," but the instruction neglected to require the court-martial to find the requisite intent. The law officer instructed the court as follows:

"The elements of the offense charged in the specification to Charge II are as follows:

(1) That the accused assaulted a certain person with a certain dangerous weapon, as alleged; and

(2) That the weapon was used in a manner likely to produce death or great bodily harm."

We condemned similar instructions in United States v. Cromartie (No. 374), 4 CMR 143, decided August 6, 1952, and again in United States v. Hunter (No. 359), 6 CMR 37, decided October 17, 1952. It was error in those instances because the court-martial found the accused guilty of the greater offense, on instructions which defined only the lesser and that is the same deficiency found here. It necessarily follows that a finding of assault with a deadly weapon only can be affirmed as the evidence is sufficient to establish that offense beyond a reasonable doubt.

VI

The next assignment of error urged by the appellant is that certain evidence concerning the death of Kim's baby was improperly brought to the attention of the court-martial to the prejudice of the accused. There were three separate episodes which need to be related together to present the issue in a light most favorable to the accused. The first arose out of the three following questions directed to and the two answers given by Mrs. Kim: "Q. Do you have any children? A. Yes. Q. How many children do you have? A. I have two children. Q. Do you have any dead children?" Defense counsel made his objection to the last question without

specifying his reasons but the law officer sustained the objection, and told the court to disregard the evidence. The second arose in the following manner: On cross-examination, the defense sought to show that the accused had not treated the baby in a rough manner, but had merely placed her on the front seat of the truck. Then on redirect examination, when trial counsel was attempting to have the witness explain some of the answers given on cross-examination the following occurred: "Q. What happened to your baby? A. She was dead." When the defense counsel objected, the law officer concluded the evidence was immaterial and admonished the court to disregard the answer. The third arose when in his closing argument trial counsel was referring to the assaults on Kim and the violence heaped on her. He made mention of the fact that she was not the only victim of his abuse, and that he had taken a little baby and tossed it around.

We see no merit in the contention of the accused. Assuming, without deciding, that the evidence was inadmissible, the answers were stricken and the court was told to disregard the evidence.

In Parmagini v. United States, 42 F 2d 721, 724, the Circuit Court of Appeals for the Ninth Circuit, stated:

". . . The court having stricken the evidence out and instructed the jury to disregard it, the jury are presumed to have done so. . . ."

The closing comments by trial counsel did not go beyond the bounds of fair argument. There was evidence in the record to the effect that the accused had taken Kim's baby and literally tossed it on the seat of the truck. The comment was supported by the record and the acts of the accused which had a tendency to shed light on his intent or his desire to assault and ravish Kim, at all costs, were the subject of legitimate comment by counsel. While inflammatory comments should be avoided, facts and circumstances interwoven with the offense need not be shunned even though they cast accused in an unfavorable light.

## VII

The next error assigned by appellant regards an entry into evidence of a written statement made by the soldier who came onto the accused and Kim when they were outside. The soldier was placed on the witness stand by the prosecution and when he appeared reluctant to testify and asserted that he could not remember some of the facts and circumstances surrounding the incident, trial counsel sought to refresh his memory by showing him a statement made the morning after the shooting. When he testified it only slightly refreshed his memory, trial counsel offered the memorandum in evidence. There was an objection interposed and the law officer interrogated the witness as to whether he remembered the facts independent of his written statement. When the witness replied that he knew the statement was accurate and correct at the time he made it; that he could not remember all the details and specifically that he could remember no more than he had testified to, the statement was admitted. The law officer used as his authority for admitting the document the following rule stated in Paragraph 132, Manual for Courts-Martial, U. S. Army, 1949, which states in part:

"Memoranda may be used to supply facts once known but now forgotten or to refresh the memory. Memoranda are therefore of two classes: *First*, if the witness does not actually remember the facts or events but relies on the memorandum exclusively, as in the case of a witness using an old diary, then the witness must be able to state that the memorandum accurately represented his knowledge at the time of its making. . . . ."

The appellant argues there was no showing that the witness did not remember all the material facts contained in the memorandum. There was, however, his admission that he could not remember more than he related and the statement showed the presence of a number of material facts which were not recalled. If we were to adopt the theory advanced, memoranda would be received in evidence only when wit-

nesses were not able to recall any of the facts contained therein and a recollection of any of the facts would bar material and competent evidence which had been preserved in a trustworthy manner. True facts which were forgotten could not be supplied because some other facts were recollected. We do not believe the rule should be so limited. We prefer to hold that where the witness is unable to recall *all* of the material facts, the memorandum may be received, provided the other requirements have been complied with.

The second objection appellant raised to the admission of the memorandum is to the effect that there was no showing that it was made at a time when the facts were fresh in his memory. In this respect, two tests have been applied by the courts to test the document for admissibility. The first may be referred to as the "fairly fresh" test, and the second as the "at or near the time" test. Wigmore, Evidence, 3d ed, sec 745. We need not decide which of the two tests should be adopted by us as we believe this memorandum fits either. The incidents took place after midnight on December 23, 1950, and the statement was made that morning. The horrifying nature of the offenses would create an impression on a normal person which would linger vividly in his mind for some considerable period of time. A few hours may have elapsed between the time of the offenses and the writing of the statement but "near the time" must, in part, be measured by the probability of the occurrence remaining fresh in the mind of the person writing the memorandum. The details of the statement, the enormity of the offenses and the relative short interval of time lead us to conclude the necessary requirements for admission were met.

## VIII

Appellant next contends that it was error to allow the prosecution to impeach its own witness, Corporal Lee. The short answer to the contention is that impeachment was not permitted. The prosecution had some difficulty in getting the witness to answer questions, and so requested the law officer to declare him hostile for the purpose of asking leading questions. The request was refused and the witness was merely required to testify as to his friendly relations with the accused. Interest, bias or prejudice for or against an accused may be shown for reasons other than impeachment.

## IX

The appellant next assigns as prejudicial error the admission of statements made by the interpreter. It is his contention that he cannot be charged with the translations between himself and the victims. Paragraph 141, Manual for Courts-Martial, United States, 1951, states that as a general rule statements through an interpreter are not provable by the translation unless it can be said that the interpreter was the agent for the person making the statement. It further states:

". . . . If the person who made the statement could have rejected the services of the individual who acted as interpreter, or in any manner agreed to his employment or to the accuracy of the translation, it may be considered that the interpreter was the agent of such person."

A better case for application of the rule than the one at hand would be difficult to conceive. The accused was under no compulsion to choose the person he did to act as his interpreter. The selection was made by the accused and perhaps the interpreter was an unwilling agent. He certainly could not be charged against the victims. The accused stood over him with a gun, and it is unlikely that the interpreter would carry on any conversation except that directed by the accused. The ever-present threat of a gun assures verity of the translation.

## X

The final assignment of error urged by the appellant is to the effect that the accused was denied due process of law because of incompetent defense counsel. It must be conceded that de-

426

fense counsel were qualified within the requirement of Article 27(b), Uniform Code of Military Justice, 50 USC § 591. This does not assure competent representation but it does show some knowledge of the subject. Appellant seeks to show how defense counsel were incompetent in their handling of the case by pointing out better trial tactics and suggesting that some steps taken should have been omitted and many steps omitted should have been taken. We have previously considered this type of problem in the case of United States v. Hunter, supra, wherein we stated:

"After appointment of counsel, as required by the Code, an accused, if he contends his rights have not been fully protected, must reasonably show that the proceedings by which he was convicted were so erroneous as to constitute a ridiculous and empty gesture, or were so tainted with negligence or wrongful motives on the part of his counsel as to manifest a complete absence of judicial character. . . ."

That the conduct of the defense counsel in this case was well above that standard is obvious. They presented some defense at the trial, showed a working knowledge of trial tactics, made timely objections, presented reliable authorities on points of law, and argued the only reasonable grounds for an acquittal or reduction. Indeed, appellate defense counsel bases some of the assignments of errors on matters developed at the trial. While we cannot know the efforts or lack of efforts used in obtaining witnesses, it is apparent that eyewitnesses were Koreans whose whereabouts may have been unknown or whose testimony would be unfavorable to the accused. In view of the mass and nature of the evidence which was presented against the accused, coupled with the fact that he had previously admitted the shooting, we are unaware of how defense counsel could have obtained a better result. To hold there was a denial of due process would permit this assignment of error to be sustained merely because appellate counsel could suggest different tactics than those used by trial counsel.

While we have reduced the charge of assault with intent to inflict bodily injury to a lesser included offense of assault with a dangerous weapon, we do not deem it necessary to return the record to the Board of Review to reconsider the sentence. Viewed in the light of the entire record, the reduction of the assault charge is trifling, and we are certain a board of review would not commute the death sentence on such a minor variation. In keeping with our holding in United States v. Hunter, supra, and United States v. James E. Long (No. 529), 6 CMR 45, decided October 17, 1952, we affirm the holding of the Board of Review.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring in part and dissenting in part):

I concur in the holding that the instructions of the law officer with respect to the charge of assault with a deadly weapon with intent to do bodily harm were defective, and require affirmance of the lesser offense of assault with a deadly weapon. This is entirely consistent with previous decisions of this Court in the area of instructions, and is likewise conformable to our disposition of such cases as United States v. Hunter (No. 359), 6 CMR 349, decided October 17, 1952, and United States v. Baguex (No. 699), 8 CMR 106, decided March 13, 1953. However, much is said in the majority opinion of which I cannot approve, and which I hesitate to let pass without comment. I shall advert specifically to those matters only with which I am most out of agreement. I am sure that the precise basis for my dissent will be apparent, as will its necessary bearing on my brothers' disposition of the case.

I cannot at all agree that the terms "malice aforethought" and "premeditation" are self-defining and easily understood in their full legal sense by persons not trained in the law. They are indeed terms of art to which has become attached a considerable ideal accretion. In a general sense—perhaps in rough essence—"premeditation" *may* mean the

same to lawyer and layman alike, but in technical detail this cannot be true. And what the term "malice aforethought" must mean to the average juror-in-the-street, I cannot possibly imagine! This is not to say, however, that I believe the law officer here erred in failing to define these terms—in the absence of a request by defense counsel to do so. We have held that the burden of requesting *clarification* of instructions, given substantially in terms of the applicable Manual subparagraph, rests on defense counsel. United States v. Soukup (No. 533), 7 CMR 17, decided January 23, 1953; see also my concurring opinion in United States v. Cobb (No. 1240), 8 CMR 139, decided March 24, 1953. So here, the instructions of the law officer as to the premeditated offense charged—phrased as they were in the language of the Manual—*did* state the elements of the offense in substance, and the burden rested on the defense to request elaboration or clarification. Having failed to meet this obligation, the law officer's instructions were not—in this particular—tainted with error.

I am sure that—properly understood—there is nothing said here which is inconsistent with previous decisions of this Court, or with prior separate opinions of my own. What I am seeking to do is to effect a proper balance between a position, on the one hand, which places the *sole* burden of protecting the interests of the accused on defense counsel, and with which I have disagreed frequently in the past, and, on the other, with a view suggesting that defense counsel is *wholly* without responsibility. This is what I believe the Code and Manual have sought to do, and this is what this Court has attempted to do in its approach to instructional clarification and elaboration.

In this connection I must also expressly dissociate myself from the unnecessary, perhaps, misleading, admonition of the majority that, "The sooner defense counsel defend properly the rights of the accused the sooner will we have good administration." This gratuitous attack on the good offices and efforts of those young officers appointed to defend military accused persons seems virtually to place the principal burden of effective military law administration on the shoulders of defense counsel. That is not at all where it belongs. Unless I wholly misunderstand the Code and the Manual, it is the *law officer* who has the primary duty of insuring a proper, fair, safe, and orderly procedure in trials by court-martial.

Reference is also made by my brothers to the fact that both trial and defense counsel read to the court from legal extracts defining "premeditation". Heretofore we have indicated clearly that such action—taken by properly and necessarily partisan functionaries of the court—cannot serve to correct or complete an erroneous instruction by a law officer. United States v. Johnson (No. 498), 4 CMR 128, decided August 7, 1952. It is the *law officer's* duty to furnish required instructions, and that duty is in no sense performed by delegation, express or implied, to other—and necessarily less responsible—persons participating in the trial. Consequently, had the law officer here been under an independent duty to define "malice aforethought" and "premeditation", his failure to do so could not properly have been regarded as cured by comments of counsel during arguments.

Further, I cannot assent to the disposition of the problem of instruction on the lesser included offense of unpremeditated murder. As I read their opinion, the majority appears to hold that the showing of intoxication in the instant case was sufficient to raise an issue as to the possibility that accused did not entertain a specific intent to kill. They could hardly have concluded otherwise, for the record is replete with evidence that, at the time of the alleged offense, he was highly intoxicated. Examining the matter of lesser included offenses, they say that the only one fairly raised by the evidence of intoxication was that of unpremeditated murder. With this observation, I have no possible quarrel. However, my brothers proceed to the conclusion that instructions were in fact given as to unpremeditated murder "for all prac-

tical purposes." At this juncture we come to a sharp parting of the ways.

They suggest that the only difference between premeditated murder and unpremeditated murder is to be found in the element of premeditation. This is probably true under the Articles of War and the 1949 Manual, in force at the time the transactions with which we are here concerned took place. However, it should be noted that this is not the sole difference between the two offenses under the Uniform Code and the current Manual — for under these sources one may be guilty of unpremeditated murder without an intent to kill, if his act causing the death of another was "inherently dangerous" and evinced "a wanton disregard of human life." Uniform Code of Military Justice, Article 118 (3), 50 USC § 712. However, granting for the purposes of the present case that the presence or absence of premeditation *is* the only difference between premeditated and unpremeditated murder, my colleagues proceed to opine that, "The question is, however, was the court-martial aware of the difference and did the members know they could return a verdict of guilty of the lesser offense?" Although there may be exceptional cases which I need not and do not now prejudge, this is indeed a novel—if not a shocking—approach to instructional deficiency of the sort asserted here, and in a capital case into the bargain. Apparently, my brothers wish to approach all instructional problems through the spectacles of sheer speculation as to whether the members of the court-martial *in fact* knew and fully comprehended what the law officer *would* have said to them had he said anything at all. This belies what rests at the very heart of the requirement that the court be instructed, and that the instructions given at the trial be spread upon the record. As I understand it, the codal notion here is that only by requiring that instructions be given can reviewing authorities be certain—*in all cases*—that the court *did* have presented to it, fully, properly and accurately, the correct legal markers to guide its decision. It must not be left out of account that no longer does a law member sit with a court-martial to advise it on legal matters step by step during its deliberations, I must indeed refuse consciously to be a party to such a whittling away of the direct commands of the Code and Manual relating to instructions. This case constitutes but a further instance in what appears to be a series of recent steps—retrogressive ones, I am sure—*away* from our early, sound and strong position in the sphere of instructions. United States v. Clay (No. 49), 1 CMR 74, decided November 27, 1951.

With this brand-new carpet extended before them, it is not difficult for my brothers to march swiftly to the goal they seem so strongly bent on reaching. The law officer said: (1) that unpremeditated murder was a lesser offense included within premeditated murder—although he did not expand on this simple statement; (2) he read to the court portions of the Manual setting out the possible effect of intoxication on specific intent and premeditation; and (3) he went on to state that if doubt existed as to the degree of guilt, the finding must be in a lower degree as to which there was no doubt. I must concede that this all sounds impressive—ever so sensible and reasonable. However, there is one modest flaw. The Code and the Manual say—and this Court has heretofore repeatedly held—that *the law officer must instruct the court on the elements of the offense charged and as to lesser offenses fairly raised as reasonable alternatives to that charged.* United State v. Clark (No. 190), 2 CMR 107, decided February 29, 1952; United States v. Roman (No. 191), 2 CMR 150, decided March 19, 1952; United States v. Banks (No. 382), 4 CMR 71, decided July 24, 1952; United States v. Stout (No. 497), 5 CMR 67, decided August 27, 1952; and United States v. Baguex, supra. That just was not done here! And *this failure constitutes clear prejudicial error*—as any student of the opinions of this Court would reasonably expect. Let me make my position clear. I simply refuse to agree with the completely untenable notion that within each proper instruction on premeditated murder there is included an adequate instruction on the unpremeditated offense.

To compound the error in their resolution of the instructional question, my brothers again point with assurance to the arguments of counsel and conclude therefrom that "all parties at the trial level understood" the difference between premeditated and unpremeditated murder. I cannot avoid regarding this approach as overruling *sub silentio* United States v. Johnson, supra.

There are numerous other matters raised by the majority which trouble me —but they are of less importance in the totality of our decisional fabric, and I shall omit specific reference to them.