UNITED STATES, Appellee

v.

RICHARD DEAN SECHLER, Corporal, U. S. Army, Appellant

3 USCMA 363, 12 CMR 119

364

LT COL George M. Thorpe, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, and 1ST LT Bernard A. Feuerstein, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by a general court-martial and found guilty on one specification of premeditated murder in violation of Article of War 92, 10 USC § 1564. He was sentenced to a dishonorable discharge, total forfeitures, and confinement for life. The convening authority approved the findings and sentence, and the board of review affirmed. We granted accused's petition for review to determine the sufficiency of the evidence and the correctness of the instructions given by the law officer.

The facts and circumstances giving rise to the charge against the accused are as hereinafter related. For purposes of clarity and brevity we refer to the Korean participants by their first names. On December 12, 1950, the accused was a member of the 50th Engineer Port Construction Company, U. S. Army, then located at Inchon, Korea. At about 6:30 p.m. on that date the victim, Son, went to a restaurant in Inchon accompanied by three other Korean Nationals, Chae, Lee and Chai. Shortly thereafter two Korean girls entered the restaurant and sat down at a table some distance removed from the Korean men. One of the girls was named Joun and she was known to both Lee and the accused. Several minutes after the girls appeared the accused entered the restaurant, armed with a carbine. He walked over to the table where Lee was seated and in a loud and angry tone of voice accused him of being too friendly with Joun whom accused claimed as his girl friend. Lee replied that he was not; the accused stated he was lying, which Lee denied, stating that he and his friends had been seated at one table while the two girls were sitting at another. The accused then left the restaurant with the two girls, but all three returned about fifteen minutes later, at which time both of the girls were crying. Lee and the other Korean men were still in the restaurant. Accused again approached Lee and in an angry manner reasserted his charge that Lee had been going about with his (accused's) girl friend. Lee protested and accused knocked him to the floor. Accused then loaded his carbine and after saying, "I will kill you," pointed it at Lee who had risen and was standing five or six feet away from accused. At that moment one of the other Korean men, Chae, who was sitting at the table, reached out to extinguish a cigarette. Accused turned toward him and fired a burst of rounds from his carbine. Son, who was closer to accused than Chae, fell to the floor mortally wounded. The firing caused the other Koreans to drop to the floor and the accused ordered them to their feet. When the victim failed to rise, the accused moved over, examined the victim, placed his hand over the wound and announced that there was nothing wrong. Lee twice suggested that the victim be taken to a hospital, but accused showed no interest in assisting

**365**

the wounded man. Shortly after the shooting he departed and the Koreans took Son to the Inchon Provincial Hospital, where he subsequently died.

The principal attack upon the sufficiency of the evidence lies in the contention that there is no showing of premeditation. Appellate defense counsel contend earnestly that the record fails to establish a premeditated killing because the prosecution evidence affirmatively reveals that the shooting was done on a sudden impulse; that there was, in fact, no time for premeditation and deliberation; that the shooting was an incident separate and distinct from accused's expressed intent to kill Lee and premeditation cannot be transferred; that neither the victim nor the person at whom accused fired were parties to accused's altercation with Lee; that the accused had no ill will towards the victim as they were strangers to each other; and, that the killing was not consciously conceived.

Counsel for accused combine these various assertions into two principal arguments by contending: (1) that regardless of whether we adopt the doctrine of transferred premeditation, the evidence in the record will not support a finding based on that principle; and (2) the record will not support a finding of intent to kill and premeditation directed specifically towards the victim. Counsel for the Government insist to the contrary. Pretermitting, for the moment, the issue of whether defense counsel is correct in stating that there is no evidence showing accused consciously intended to kill the victim, the argument of the Government must prevail if, as a matter of law, the accused's announced premeditated intent to kill Lee Jong Ok can be transferred to the victim. See People v. Walker, 76 Cal App 10, 172 P2d 380; Batts v. State, 189 Tenn 30, 222 SW2d 190; and Martin v. State, 96 Tex Cr Rep 575, 259 SW 572. The general rule is stated in Warren on Homicide, § 73, page 313, as follows:

"The killing of a third person while making a felonious assault on a second person is murder. If a man attempts to kill another without justification, without provocation and not under circumstances of mitigation,

and in pursuance of that effort hits and kills a third person, his guilt is measured by the same standard as though he had killed the person originally intended. Whether defendant who shot at one person and killed another is guilty of homicide, in any of its grades, or not, depends on the character of his act, and his intent, whether criminal or not, as applied to the person whom he intended to shoot. The thing done follows the nature of the thing intended to be done, and the guilt or innocence of the slayer depends upon the same considerations that would have governed had the blow killed the person against whom it was directed. . . ."

In the case at bar we entertain no doubt that if the accused, in furtherance of his declared purpose to kill Lee, had shot at him and for some reason missed him, instead killed the deceased, the court-martial could have rightly found him guilty of premeditated murder under the rule of transfer of intent and premeditation. However, the situation which confronts us is somewhat different, and hence that rule becomes inapplicable. Here the homicide did not occur through accused's efforts to kill the person against whom he had expressed hostility. An intervening circumstance occurred between that expression and the actual killing. The accused, while evidencing premeditation by his threats to murder Lee, apparently became disconcerted by the movement of another. He turned away from his proposed victim and shot in the direction of the other but hit still a third person. A review of decided cases indicates that courts have refused to apply the rule of transferring premeditation and intent under similar circumstances.

In State v. Batson, 339 Mo 298, 96 SW 2d 384, the accused was charged with the killing of one Dr. Poole. The evidence at the trial showed that the defendant, who had a grudge against Rabenau, a justice of the peace, appeared at the door of the latter's office with a pistol in his hand. The defendant accused Rabenau of forging his name, and fired four shots into Rabenau's back as he sat at his desk.

Rabenau was killed instantly. Dr. Poole was on the other side of the room with Deputy Constable Nece. Immediately after the shooting of the justice, Nece charged toward the defendant. The defendant turned, shot at Nece, but the bullet missed him and struck Dr. Poole, who died a short time later. The accused was charged with the first degree murder of Poole (not of Rabenau), found guilty as charged, and sentenced to death. The members of the jury were instructed to the effect that the mental attitude of defendant toward Justice Rabenau could be transferred to the killing of Poole. On appeal the conviction was reversed. The reversal was based upon the instructions given by the trial judge and the following language from the appellate court's opinion is apropos in the present instance:

"But, while it is not true that appellant was acting in self-defense when he fired the shot that hit Dr. Poole, yet it is true that all the evidence shows that the shot was directed at Nece, and not Rabenau. He had already shot Justice Rabenau in the back four times at close range. Nece was in another part of the room twelve feet away, and, when the appellant turned and fired at him, the bullet could not possibly have been intended for Rabenau. In these circumstances, was it proper to tell the jury, if they believed the appellant willfully, deliberately, premeditatedly, and maliciously attempted to shoot and kill Rabenau, and in that attempt shot and killed Poole, the law would attach the aforesaid willfulness, deliberation, premeditation, and malice to the killing of Poole? We think not, unless it can be said the shooting at Nece was a part of the attempt to kill Rabenau within the meaning of the applicable rule of law, and such is not our understanding of the rule.

. . . . . . . .

". . . it seems clear that the act with respect to which the felonious intent will be 'transferred' from the object of the accused's design to the victim, is the homicidal act directed at the former and resulting in the death of the latter, and not some antecedent act. The rule contemplates only the one felonious act, the result of which is unintended. The illustration most frequently given is taken from Blackstone, where he says it is murder if one shoots at A and misses him, but kills B. 4 Blackstone's Commentaries, p. 201. . . ."

In State v. Cole, 132 NC 1069, 44 SE 391, the defendant, together with several other negroes, was causing a disturbance in the white section of a train. The conductor, Clement, requested that they go to the colored section, which they eventually did. Shortly thereafter a scuffle ensued between the conductor and the negroes and the defendant drew a pistol. A porter attempted to prevent defendant from firing at anyone, but was shot during his attempt. The road master, Stevens, entered the car and defendant raised his pistol and shot him, killing him instantly. At the trial the members of the jury were instructed that the defendant could be found guilty of first degree murder if they believed that he had a premeditated design to kill Stevens or if they believed Stevens was killed by accident by the defendant in furtherance of a premeditated design to kill Clement. The Supreme Court of North Carolina held this rule inapplicable in the circumstances of the case stating (page 394):

". . . In this case, with the full statement of the uncontradicted testimony of an eyewitness, which is consistent and bears the impress of truth, we are forced to the conclusion that there was not sufficient evidence that the prisoner killed the deceased 'in an effort to kill Clement, or that he had, with deliberation and premeditation, formed a fixed purpose to kill Stevens.' We do not pass upon or express an opinion in regard to his purpose to kill Clement, but assuming, for the sake of the argument, that he had done so, he did not have his pistol pointed towards him, but as Stevens came in 'he raised his pistol.' The position of Clement at the moment that Stevens came in the car rendered it impossible for the prisoner to shoot at him and hit Stevens. Clement says expressly that, as Stevens came in, the prisoner raised his pistol and shot. The coming in of

Stevens, who was doubtless attracted by what had occurred and the noise, was a separate and independent incident of the transaction. It bore no legal relation to the then condition of the parties. It was the intervention of a new element or agency, and brought about an unexpected, and in a legal sense, independent, result. . . ."

Although those cases were reversed because of erroneous instructions, the rule enunciated therein prompts us to limit the degree of homicide to the mental attitude with which accused fired at Son as a premeditated design to kill Lee was not the influence which caused the firing of the weapon. Rather the shooting was the result of either a premeditated intent to kill the victim or it was caused by an intervening occurrence which prompted the accused to turn from his intended victim and fire impulsively in another direction. We are impelled to disassociate the prior threats to kill Lee since it is certain the shots could not have been intended for him. If we do that we must disregard the time which was available to the accused to think out the killing of Lee and evaluate the testimony as it pertains to the actual killing of Son. This circumscribes our review of the record to a determination of whether the evidence is sufficient to show the existence of intent and premeditation in the killing of the latter.

In United States v. Goodman, 1 USCMA 170, 2 CMR 76, decided February 11, 1952, we acknowledged the rule that premeditation could be inferred from the facts and circumstances surrounding the killing. We there stated:

"It is well settled that the premeditation required for conviction of premeditated murder may be inferred from the circumstances attending the killing. Whether or not there has been the required premeditation is a question of fact for the jury or, as in this case, the trial court. The trial court is entitled to examine all the facts of the case, and should carefully consider all the evidence, in reaching a determination as to wheth-

er or not premeditation existed. The question is one of fact. Wharton, Criminal Law, page 739. . . ."

Appellate defense counsel does not question the foregoing rule but asserts the facts and circumstances do not support a finding of premeditation. He argues that the case at bar comes within the rule announced by the United States Court of Appeals for the District of Columbia in Bullock v. United States, 122 F2d 213. There, the defendant and another were engaged in a drunken quarrel when a policeman appeared upon the scene. Defendant, who had a loaded revolver in his hand, turned and shot the policeman. The appellate court reversed a conviction of murder in the first degree, stating:

". . . [W]e all think the evidence insufficient to show that the killing was deliberate and premeditated. When the victim, a police officer, came on the scene, appellant was engaged in a drunken quarrel with another person and had a loaded revolver in his hand. There is no sufficient evidence that appellant was facing in the officer's direction, or knew of his presence, until he spoke. The officer asked 'What's the trouble around here?' or 'What's all this racket about?' The prosecutor, in his opening statement to the jury, conceded that 'as soon as the officer spoke, defendant shot him.' Shortly before the close of the trial the court said: 'The way it impresses me from the evidence is that the officer was right on top of them, and almost momentarily the man pulled the revolver and shot him.' In denying a motion for a new trial the court said: 'My view is that the defendant did not realize a police officer was nearby until the officer called out the question "What's the trouble around here?" and that it was a matter only of a second or two before the defendant fired the two shots in rapid succession which resulted in the death of the police officer.' The evidence overwhelmingly supports these statements of the prosecutor and the judge. Accordingly it does not support a conviction of first degree murder. There is nothing deliberate and premedita-

ted about a killing which is done within a second or two after the accused first thinks of doing it; or, as we think the evidence shows, instantaneously, as appellant, interrupted in his quarrel, turned and fired. Appellant's motion for a directed verdict in respect to first degree murder should have been granted."

Whether we agree with the rationale of the *Bullock* case is of no moment as we believe that case is distinguishable from the one at bar. Implicit in that opinion is the concept that if some appreciable time elapses in which the accused meditates on an intent to kill and then executes it, he can be found guilty of premeditated murder. The appellate court concluded the circumstances of that case foreclosed a finding of premeditation but it was there conceded that defendant did not know of the presence of the police officer until he spoke. The sudden speaking from behind by one whose presence is not known is startling and the reaction may be impulsive and involuntary. The short interval of time between the officer's words and accused's firing of the pistol was held not to be sufficient for the accused to reflect on his act and to indulge in the necessary deliberation required for premeditation.

The facts and circumstances presented by the record now under consideration present a different situation. The court-martial was required to, and did, find premeditation as an element. It was fully aware of what must be established as the following definition was given as part of the instruction:

". . . A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intention to kill someone and consideration of the act intended. Premeditation imports substantial, although brief, deliberation or design. . . . . ."

The sole question thus posed is, does the evidence support the finding of premeditation based on that definition? Here, there was no sudden and startling event which would bring spontaneous reaction into play. The accused had been present in the restaurant prior to the time the shooting occurred. He knew the Korean men were present in the room when he engaged in the first altercation. The room was only eight or ten feet wide and twelve or fifteen feet long and in a room that small, it is unlikely that the presence and position of its occupants would go unobserved on his subsequent return. When he returned he stood on the door sill, looking into the room, again making his accusations against Lee. After castigating Lee, he knocked him down and loaded his carbine with the apparent intent of shooting him, as he announced that intent. These activities must have consumed sufficient time for accused to plan a course of conduct and this may have been to kill Lee or anyone in the room if they interfered with his plan. During this time deceased and one other Korean were seated at a table over at the side of the room. The only movement reflected by the record is the change in position that a man seated at the table would make to put out a cigarette. Such a limited movement would hardly create a sudden emergency which would cause an assailant to become frantic and shoot impulsively. Accused, when he turned to shoot, knew he was firing at another Korean and his quarrelsome and belligerent attitude was not limited to Lee. That he intended to impose his will on all, at any cost, can be gleaned from his actions both before and after the killing. Immediately after each of his entrances he began an apparently unprovoked assault on Lee. Accusations and threats were made. During his absence with the girls he apparently evidenced hostility toward them since upon their return both were crying. His deliberate loading of the weapon was either to kill Lee or to shoot anyone else, if that became necessary. He shot an innocent victim without reason or excuse. After firing three or four rounds and observing the Koreans on the floor and under his line of fire he ordered them to their feet. When he noticed the victim did not get up he went over, placed his hand on the wound, announced the man was all right, refused to assist in rendering any aid

**369**

and casually departed. That hardly paints a picture of malice toward one, or mental confusion and emotional excitability. Neither does it suggest a spontaneous and involuntary act induced by surprise or a sudden and unlooked-for emergency.

Some light, albeit little to us but perhaps more illuminating to the court-martial, was shed on the time intervening between the movement of Chae and the shooting of Son. During his cross-examination of Lee, defense counsel requested that the witness demonstrate to the court exactly how accused moved at the time he turned and fired. The witness did so, and defense counsel described his actions for the record as follows: "The witness was standing up with his right arm crooked at the elbow. The witness turned the upper part of his body and moved his feet slowly. The arm was kept at the same position." This demonstration could not be accurately reflected in the record but it could be observed by the court and from it a determination made as to the manner in which the accused carried out his shooting. It would possibly be the best method of portraying an involuntary reaction or a deliberate shooting. We are not unaware that defense counsel phrased a question of the witness which inquired if accused was facing Lee when he "suddenly" turned and fired and the witness responded affirmatively. However, if that raises a conflict, the finders of fact have the duty of resolving conflicts in the testimony and and we need not assume they believed that evidence which is unfavorable to the finding and rejected the favorable.

Moreover, although the time within which the accused could deliberate upon his actions is a persuasive circumstance in determining the presence of premeditation, it must be considered in connection with all of the evidence in the record bearing upon this issue. In United States v. Aikins and Seevers, 5 BR–JC 375, 390, the Judicial Council in the office of The Judge Advocate General of the Army stated as follows:

". . . . The deliberation or design imported by premeditation may be brief so long as it is substantial.

(MCM, 1949, par 179a, p 231). If one forming an intent to kill pauses even momentarily and considers the intended act, he deliberates. *The fact of deliberation, not the length of time it continues, is important* (Fisher v. United States, 328 US 463 (1946)). *Not even minutes need elapse, for deliberation may be instantaneous.* . . ." [Emphasis supplied].

There is no conflict in the testimony and no direct evidence on what prompted accused to shoot. Certainly the record affirmatively discloses that the Koreans in no way precipitated any difficulties. They were inoffensive and minding their own business. There is not the slightest suggestion that the killing was excusable, justifiable or accomplished under mental strain or because of heat of passion. Obviously, whether there was deliberation and premeditation must be inferred from the facts and circumstances we have related. However, if the court-martial could find beyond a reasonable doubt a premeditated intent from them, the findings must be affirmed. We believe the evidence is such as to permit that finding by the triers of fact. Accordingly, the contention that the evidence is insufficient to sustain a finding of premeditation is overruled.

Appellate defense counsel has advanced several arguments that the instructions were erroneous. All but one can be brushed aside with little discussion. There were no lesser degrees of homicide other than unpremeditated murder raised reasonably by the evidence. The record is devoid of any evidence of negligence, either simple or culpable, and there is no evidence of such provocation as would reduce the offense to voluntary manslaughter. The necessity of giving instructions on included offenses is, therefore, not present. Accused's contention that there should have been an instruction on attempted murder is without merit since the death of the victim was established beyond all reasonable doubt. Moreover, the fact that the law officer related some disassociated and irrelevant examples on premeditated murder

was not prejudicial in the present setting.

The only alleged instructional defect having merit is that the law officer erred in failing to define unpremeditated murder. The offense was charged under the 92nd Article of War, *supra,* which provided as follows:

"Any person subject to military law found guilty of murder shall suffer death or imprisonment for life, as the court-martial may direct; but if found guilty of murder not premeditated, he shall be punished as a court-martial may direct. . . ."

The law officer, after setting forth the elements of the offense charged, defined premeditation in ▬▬▬▬ ▪ the language hereinbefore set forth. He then advised the court-martial that murder, voluntary and involuntary manslaughter, attempt to commit murder, assault, assault and battery, were lesser included offenses. This was followed by the usual admonition that if the court-martial had a reasonable doubt as to the degree of guilt, it must return a finding in a lower degree as to which there is no reasonable doubt.

As previously shown, under Article of War 92, the sole distinction between the crime of premeditated murder and that of unpremeditated murder is the element of premeditation. We have previously stated that the names of the two offenses reveal the only difference between the two degrees of the crime and the definition of premeditation necessarily differentiates the more serious offense from the included one. See United States v. Day, 2 USCMA 416, 9 CMR 46, decided April 30, 1953. We have also held that in testing the sufficiency of instructions we must consider them in their entirety and give weight and consideration to each. The rule is stated in 53 American Jurisprudence, Trial, § 842, at page 618, as follows:

"In considering the correctness and adequacy of a charge to the jury, it should be taken as a whole and read in its entirety; that is, each instruction must be considered in connection with others of the series referring to the same subject and connected there-with, and if, when taken together, they properly express the law as applicable to the particular case, there is no just ground of complaint, even though an isolated and detached clause is in itself inaccurate, ambiguous, incomplete, or otherwise subject to criticism. The rule is applicable in both civil and criminal cases."

In the instant case, the definition of premeditation which the law officer gave clearly defined that element. He informed the court-martial that there were two degrees of murder, and that the sole differentiating element was premeditation. He explained that a murder is "not premeditated" unless consciously conceived and intended. He charged that if there was a reasonable doubt as to the guilt of the accused of the crime charged, the court-martial should return a verdict of guilty of a lesser crime as to which there was no reasonable doubt. We are unable to perceive how, or in what way, the accused was prejudiced by insufficient instructions. All that is required of the law officer is that he set out clearly the elements of offenses which are reasonably raised by the evidence. This was done in the instant case.

Having disposed of the assignments of error in a manner contrary to the contentions of the accused, we affirm the decision of the board of review.

Chief Judge QUINN concurs.

BROSMAN, Judge (dissenting):

Try as I may, I cannot agree with my brothers concerning either evidential sufficiency as to premeditation, or the propriety of the law officer's instructions on unpremeditated murder. See United States v. O'Neal, 1 USCMA 138, 2 CMR 44, decided February 7, 1952, on the first issue, and my separate opinion in United States v. Day, 2 USCMA 416, 9 CMR 46, decided April 30, 1953, cited by the majority, on the second. In the *Day* opinion I said, "I simply refuse to agree with the completely untenable notion that within each proper instruction on premeditated murder there is included an adequate instruction on the unpremeditated offense."

I must particularly question my

**371**

brothers' reliance on United States v. Aikins and Seevers, a board of review case cited in the majority opinion, for the proposition that "deliberation may be instantaneous." I had not thought that this view accorded with that expressed in the better considered Federal cases. See Bullock v. United States, 122 F2d 213 (C. A. D. C. Cir.); Jones v. United States, 175 F2d 544 (C. A. 9th Cir.); Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318, 166 ALR 1176. In the Bullock case the court said at page 213: "To speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, is a contradiction in terms. It deprives the statutory requirement of all meaning and destroys the statutory distinction between first and second degree murder."

I would affirm as to unpremeditated murder and return to the board of review for reconsideration of the sentence. See United States v. Baguex, 2 USCMA 306, 8 CMR 106, decided March 13, 1953.