UNITED STATES, Appellee

v.

ERNEST L. RANSOM, Private E–2, U. S. Army, Appellant

4 USCMA 195, 15 CMR 195

No. 4107

Decided April 23, 1954

 

LT COL James C. Hamilton, U. S. Army, and 1ST LT Robert C. Taylor, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Convicted by a general court-martial in Korea of premeditated murder, rape, and other violations of the Uniform Code of Military Justice, the accused was sentenced to death. With a minor modification, intermediate appellate authorities approved the findings of guilty and the sentence. The case is before this Court on mandatory review.

A number of errors are assigned. Most of them require consideration of the evidence.

On the night of April 18, 1953, First Lieutenant A. P. Brunner received a telephone report of trouble at his C-6 Gun Position. He arrived at this position about 10:00 o'clock and saw the accused with an entrenching tool in his hand. Approaching him, he said: "Ransom, this is Lt. Brunner. Put down the shovel. Come along with me." Brunner was wearing his insignia of rank. Instead of complying, the accused "made several passes" with the shovel at the Lieutenant's head. The accused kept muttering, "I will kill you." He also made such statements as "kill me and put me out of my misery," "[I've] taken enough stuff," and "[I'm tired] of taking all of that —." During this exchange, a Lieutenant Button came on the scene. Although the accused recognized him and addressed him by name, neither he nor Brunner could quiet the accused. As they, and the other personnel present, tried to subdue the accused physically, he leaped over a barbed wire fence and escaped in the darkness. Brunner did not know whether the accused had been drinking, but a Private First Class Hicks testified that he "could tell [the accused] had been drinking heavily."

The accused was next seen at Position C-14. About 2:00 am he suddenly appeared and stuck a carbine in the back of the guard, Private Donato. Although the accused said, "Don't worry, I won't hurt you," Donato heard him cock the weapon. The accused gathered up some firearms and a can of ammunition and left.

About 2:40 am, automatic gun fire was heard in the area. To Kin Byong Tak and Kim Hong Shik, Sergeant and Corporal, respectively, of the Korean guard, it seemed to come from the vicinity of their Post 6, which was in front of the American commanding officer's quarters, in a building that housed staff officers. Lieutenant W. W. Niebuhr, who was quartered in the

**197**

building, was awakened by the shots. He heard someone groan. Looking out of his window, he saw nothing, and so went back to bed.

The Sergeant and Corporal of the Korean guard converged upon Post 6, from different directions. The Corporal arrived first. Not seeing the guard, he called to him, but received no reply. He widened his search. About six meters away, on the other side of the open doorway in a wooden fence separating the area from a Korean factory, he found a body lying face down on the ground. He identified it as Chae Seung Man, the guard assigned to Post 6. About this time the Sergeant of the Guard arrived. He too identified the body as that of Chae.

Both guards proceeded to the motor pool office to report their findings to the American personnel. Lieutenant Niebuhr was called. He and the Korean guards examined the area. A few feet from the doorway of the staff quarters, Lieutenant Niebuhr picked up a carbine, which Kim Byong Tak believed was Chae's. Off to the side, were two empty cartridge cases. In due course, an ambulance arrived and the driver examined the body. It was also viewed by Private Cullip, of the local Military Police, who "deemed" it to be dead. Cullip accompanied the body to the "CAC Korean hospital." Hospital reports show the cause of death to be "unnatural," "Piercing bullet wound to the stomach." They also show that the "Heart was stopped but had a little temperature."

Some time between 3:00 am and 3:40 am, the accused, carrying a carbine, again appeared at C–6. He talked with Hicks. In the course of the conversation, he told Hicks that somewhat earlier a Korean guard had been "bothering him" and "he probably had hurt him, killed him." The accused then left, still carrying the gun. Hicks thought that at this second meeting, the accused "was a lot soberer than the first time."

About 4:00 am, Sin Byong Chul, who lived with his wife and fourteen-year-old daughter in a small one-room house down the road from the C–6 position,

was awakened by a noise outside his door. He was talking to his wife about the noise, when the door opened, and the accused entered. The accused was armed. He looked around and asked for "light." Sin gave him a candle. The accused made Sin come to him and turn around with his hands behind his back. Sin did as directed, and the accused tied his wrists with the shoestring taken from his own boot. He pushed Sin against the wall, loaded his gun and pointed it at him. Sin cried out "No, No." Sin's wife started to expostulate excitedly in Korean, and the accused waved the gun at "all family." Sin entreated his wife to quiet down because he feared that the accused would kill all of them. Sin and his wife were made to lie down. The accused blew out the candle and lay down next to Jung Yei, Sin's daughter.

We need not recount the details of what happened next. Suffice it that Jung Yei ran to her mother, who pleaded with the accused that "This is baby. This is aegeeya." Nonetheless, the accused pulled Jung Yei from her mother's embrace and hit Jung with his gun. He then completed the act which resulted in the charge of rape. About a half-hour later, the accused fell asleep. However, no one attempted to leave the house because Sin was afraid that, if any of them moved, the accused might awaken and kill the whole family.

Dawn broke about an hour later. At that time a neighbor appeared at Sin's house. She was told to bring the Military Police. Almost immediately she found Sergeant Lambert, a military policeman who had been searching for the accused since 4:00 am. Lambert proceeded to the house and awakened the accused and took him into custody. On the floor next to the accused he found a carbine and ammunition.

About 6:00 am, April 19, Jung Yei and the accused were examined at the 543 General Dispensary by Captain M. Tacktill, an Army doctor. He found that Jung Yei had a lacerated hymen that was still bleeding. His clinical impression of the accused was "acute alcholism." This was verified by a blood

specimen which showed an alcohol content of 2.5 mg. per cubic centimeter.

At daylight, Lieutenant Niebuhr again searched the area of the shooting. Eight empty cartridge cases were found at the corner of the staff building. At this point the driveway, which provided ingress and egress to the building entrance, joined the main road. This was a distance of about 25 feet from where Chae's carbine and the other two empty cartridge cases had been found. Four expended bullets were found in the wall of the factory, just beyond Chae's body.

Shortly after 2:00 pm that day, the accused was interviewed by Agent C. F. Walker of the Criminal Investigation Division. He was informed of the nature of the charges against him and warned of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. No promises of reward or immunity were made to him. The accused then made a statement which was reduced to writing. Each page was read and signed by him. He also initialed certain changes in the text. We need not here set out the statement; it is sufficient to note that it traces the night's happenings with great detail. It was admitted in evidence, without objection by the defense.

Included in the prosecution's case is expert testimony on a number of ballistic tests with the carbine taken from the accused at Sin's house and the slugs and cartridge cases found at the scene of Chae's shooting. The qualifications of the witness as an expert on ballistics were conceded by the defense. The tests conclusively established that four of the eight cartridge cases found at the intersection of the driveway and the main road were fired from the accused's carbine; the results as to the other four were inconclusive. The two cartridge cases found near Chae's carbine were also fired from the same weapon. So too were the four slugs extracted from the factory wall behind Chae's body.

The case for the defense consisted solely of the previously mentioned testimony by Captain Tacktill, in relation to his clinical impression of "acute alcoholism" when he examined the accused at the dispensary, and the blood alcohol test. However, Dr. Tacktill conceded that each individual reacts differently to alcohol. He testified that, "Some people can take a certain quantity and a small amount and become intoxicated. Other people have a so-called 'wooden-leg' and can drink large quantities and not become intoxicated." The accused did not testify.

When both sides rested, the law officer in an out-of-court conference in the accused's presence, discussed with both counsel his proposed instructions to the court. He asked if either desired further instructions, and each replied in the negative. On the reopening of the court, counsel made their respective closing arguments, without interruption or objection. The law officer then instructed the court on the elements of each principal offense and the lesser included offenses raised by the evidence, particularly that of intoxication. At the conclusion, the law officer again asked counsel if they desired any further instruction, and each answered in the negative.

We turn our attention first to the murder charge. The accused attacks his conviction of this offense on two grounds: (1) that the evidence is insufficient to establish beyond a reasonable doubt the fact of premeditation; (2) that the law officer's instruction was prejudicial.

The first claim of error has two parts: (a) that the evidence shows intoxication to such a degree that, as a matter of law, he could not have had a premeditated design to kill; and (b) that apart from intoxication, the evidence is legally insufficient to support a finding of premeditation.

Undoubtedly, the accused had consumed a substantial amount of liquor. In his pretrial statement he said that, from about 6:15 pm on April 18, until he went to the C–6 position (about 10:00 pm), he drank a fifth of whiskey. Hicks testified that he believed the accused had been drinking heavily. Dr. Tacktill's clinical impression of him at

6:00 am the following morning was acute alcoholism; this was supported by the finding on the blood alcohol test. On the other hand, there is a great deal of evidence to show that, although he had been drinking, the accused knew what he was doing and had complete physical coordination and control throughout the night.

We need not detail all of the evidence which bears on accused's mental and physical capacity. Looking at each of the major events, we find the following: At the C–6 position at 10:00 pm, recognition of persons and a successful avoidance of all efforts to take him into custody; in the interlude with Private Donato at about 2:00 am, accused calmly told Donato that he would not hurt him; in his conversation with Hicks at 3:00 am, he appeared "a lot soberer" than earlier in the evening; and at 4:00 am, there is his display of intelligence and muscular coordination in removing the shoelace from his boot to tie Sin's wrists.

Weighing one group of facts against another is the obligation of the triers of fact. Under complete instructions from the law officer as to the effect of intoxication in a murder case, the issue was decided against the accused. The record contains substantial evidence to support that finding. Consequently, we find no merit in this part of the accused's claim.

No one witnessed Chae's killing, but his death by criminal means clearly appears. The accused's implication as the killer is equally clear. Coupled with his pretrial statement, to which further reference will be made, are his presence in the area, his possession of the weapon which fired the bullets found near Chae's body, and his statement to Hicks shortly after the shooting. Consequently, if the evidence is legally sufficient to show a premeditated design to kill, the conviction must be upheld.

In his pretrial statement, the accused relates the circumstances of the shooting as follows:

". . . On the way /i/ ER to C–14 I saw a jeep so I hide and then go on to C–14. I went inside and picked up a box of ammo then I goes outside and took up the phone and said C–6 you want RANSOM, he is at C–14 and then tore the phone off and throwed it down. I makes the guard go inside and I picked up the carbines and throwed them over the fence and took a grease gun and I still had the carbine I took from dog battery. They came up and I shot close by them and then I recognized Lt. Butner's voice and he told me alright RANSOM you better com on out, so I ran on down the hill from C–14 and walking down the road some guy hollered at me and I kept going and then he hollered again and I turned loose on him with my carbine and kept going and I wind back up at C–6 . . .

"Q. When you left C–14 and was coming down the /i/ ER road and somebody was yelling at you, you mentioned that you opened up on him. Just where were you standing at the time you opened up on him?

"A. I was standing by the wall and fired into the alley where he was.

"Q. Do you remember how many rounds you fired into the alley?

"A. I had it on automatic and I don't know.

"Q. /i/ ER Was the carbine you had with you, when arrested by the Military Police the same one that you used to fire into the alley?

"A. Yes.

• • • • • •

"Q. When you fired the carbine up the alley did you hear anyone groaning or making noise that would tell you that they were hit?

"A. No.

"Q. Did you know that· you hit someone when you fired up that alley?

"A. No.

"Q. Why did you fire up the alley?

"A. He kept saying something to me and I was already angry and confused and I shot at him."

His statement to Hicks shows that the accused knew that the "guy" he fired at was a Korean guard.

Speaking of premeditation, the court in Bostic v. United States, 94 F2d 636 (CA DC Cir 1937), cert den 303 US 635, said:

"The authorities agree that no particular length of time is necessary for deliberation. . . . It is not the lapse of time itself which constitutes deliberation, but the reflection and consideration, which takes place in the mind of the accused, concerning a design or purpose to kill. . . . Lapse of time is important because of the opportunity which it affords for deliberation. . . . The human mind sometimes works so quickly as to make exact measurement of its action impossible, even with the facilities of a psychological laboratory. The jury must determine from the circumstances preceding and surrounding the killing whether reflection and consideration amounting to deliberation actually occurred. . . . If so, even though it may have been of exceedingly brief duration, that is sufficient. It is the fact of deliberation which is important, rather than the length of time during which it continued. . . . In one jurisdiction it has been said that deliberation may be present even though the act of killing follows the intention to kill as instantaneously as successive thoughts of the mind. . . . In others the courts have insisted that some appreciable time must elapse in order that reflection and consideration amounting to deliberation may occur. . . . This is the better statement of the rule. Even in the latter jurisdictions, however, it is recognized that this does not require the lapse of days or hours, or even minutes."

We cited that case with approval in United States v. Goodman, 1 USCMA 170, 173, 2 CMR 76. However, we held in Goodman that premeditation may be inferred from the circumstances. Essentially, the question of its existence is one of fact for the court.

According to his pretrial statement, when the accused took the ammunition and firearms from the C–14 position, he telephoned C–6 to tell them where he was; when they came for him, he shot at them and ran away. As he proceeded down the road he was "hollered" at by a "guy," whom he recognized as a Korean guard. He ignored the guard's first call, but on the second "turned loose on him" with automatic fire from his carbine. With this evidence before it, we cannot say that the court was not justified in concluding that the crime was premeditated. See: United States v. Sechler, 3 USCMA 363, 12 CMR 119; United States v. Hunter, 2 USCMA 37, 6 CMR 37.

The second claim of error as to the murder charge relates to the law officer's instructions. The law officer instructed the court that a finding of guilty of unpremeditated murder, as a lesser included offense to the principal charge, could be returned, if death was caused by the accused while engaged in an act inherently dangerous to others and evincing a wanton disregard for human life. Relying on our holdings in United States v. Holsey, 2 USCMA 554, 10 CMR 52, and United States v. Davis, 2 USCMA 505, 10 CMR 3, the accused contends that the instruction is erroneous because the evidence does not show that his act was dangerous to any person other than the victim. Assuming the correctness of this contention, the error could not possibly have harmed the accused.

An error in the law officer's instruction may be noticed on appeal even in the absence of defense objection, if the accused is deprived of or prejudiced in a substantial right. United States v. Williams, 1 USCMA 186, 2 CMR 92; United States v. Grossman, 2 USCMA 406, 9 CMR 36. Inasmuch as the instructions on premeditated murder were correct and the court found the accused guilty of that offense, he could not have been harmed by an incorrect instruction on the lesser included offense. State v. Zupkosky, 127 NJL 218, 21 A2d 771; see also Kemp v. Government of Canal Zone, 167 F2d 938 (CA5th Cir 1948).

We turn our attention now to the charge of rape. No conclusion other than that of guilt can be drawn from

the evidence. However, the accused maintains that he was ▮▮ prejudiced by inflammatory statements in trial counsel's closing arguments. No attempt has been made to isolate the remarks which are declared to be prejudicial, but, nonetheless, we have examined the entire closing argument with great care. The remarks of trial counsel were essentially comments on the reasonable inferences to be drawn from the circumstances. As such, they did not overstep the bounds of propriety and fairness. United States v. Day, 2 USCMA 416, 9 CMR 46.

The accused was also convicted of assault on Lieutenant Brunner in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684. He now maintains that the evidence of intoxication was so great as to show conclusively that he did not know that he was confronted by a superior officer. We answered this contention in our discussion on premeditation. Nothing need be added, except to note that, in his pretrial statement, the accused acknowledges his awareness of Lieutenant Brunner's presence and status. Thus, he refers to his conduct at the C–6 position as follows:

". . . I left there and went back to C–6 when I got back to C–6 the /i/ ER Lt and about 15 or 16 more guys were there. They was saying they wanted me but I don't know what they wanted me for. I couldn't understand. Then I swung at them with my entrenching tool and run jumped over the fence. . . ."

Here, for the first time, the accused contends that his pretrial statement should not have been admitted in evidence. At the trial, defense counsel was expressly asked by the law officer whether he had objection, on any ground, to the admission of the statement. He replied in the negative. Nevertheless, it is now urged that the accused was so intoxicated that he could not have had any understanding of his rights under Article 31, supra. The evidence clearly shows that the ac-

cused was fully warned of his rights. His statement was reduced to writing in his own language. Each page was read and signed by him. The whole statement discloses details of the events that could only have been known by the accused. From this, and the other evidence set out in our discussion of premeditation, we cannot say that the record shows conclusively that the accused did not understand his rights, and did not know what he was doing, when he made his pretrial statement. As a matter of fact, it appears to us that the evidence compels the conclusion that the accused had full knowledge and a clear appreciation of his rights and his action.

Also raised, for the first time in this Court, is a claim of error resulting from an in-court discussion by the law officer and trial and defense counsel, outside the hearing of the accused. The error is not amplified in the accused's brief. The record shows that after Sin Byong Chul's cross-examination, the following transpired:

"TC: Does any member of the court desire to question the witness?
"LO: Any questions by the court?
"PRESIDENT: No questions.
"LO: Any redirect?
"TC: No, sir.
"LO: Both you and Slate—

"Trial counsel, defense counsel and the law officer then conferred out of the hearing of the reporter and the court."

An in-court conference between a judge and counsel for both sides is common practice in the trial ▮▮ of a case in civilian courts. It is uniformly resorted to for the specific purpose of keeping from the jury a discussion of legal matters which do not concern them. The practice is both proper and useful, and is recognized in the court-martial system. See Manual for Courts-Martial, United States, 1951, paragraph 57g(2), pages 81–82. The trial procedure guide set out in Appendix 8a of the Manual provides for its use as follows:

"— in-court conference:

202

"DC (TC): I would like to confer with the law officer out of the hearing of the members of the court.

"LO: Counsel for both sides and the accused will come forward.

"Note: —After an in-court conference, the procedure may be as follows:

"LO: Let the record show that the accused and counsel for both sides conferred with the law officer out of the hearing of the members of the court. (The trial will proceed.)".

Apparently because of the Manual provisions, the accused regards his absence from the conference as constituting prejudicial error. Assuming for the purposes of this case that it was error not to have the accused present at the in-court conference, and assuming also that the record may be read to show that the accused did not in fact hear the discussion in this case, we conclude that the accused was not harmed.

A conference of this nature is entirely unlike an unrecorded conference between the law officer and the court, out of the presence of the accused. United States v. Miller, 2 USCMA 272, 8 CMR 72. Neither does it in any way destroy the completeness of the record of the actual court proceedings against the accused. See: United States v. Nelson, 3 USCMA 482, 13 CMR 38. Out-of-court hearings between the law officer and counsel need not be recorded. Manual for Courts-Martial, supra, paragraph 57g(2), paragraph 82b. Even if the accused could not hear the discussion, his counsel participated in it. Procedural matters of this nature may properly be conducted by accused's counsel, and counsel's conduct will bind the accused. United States v. Cambridge, 3 USCMA 377, 12 CMR 133. Therefore, we find no prejudice resulting from the in-court conference.

The accused's final claim is that the board of review erred in reducing a robbery charge to that of assault with a dangerous weapon. The board of review affirmed only the lesser offense because of error in the law officer's instruction on the principal charge. The accused maintains that assault with a dangerous weapon is not included within the robbery charge. This contention is answered by our decisions in United States v. McVey, 4 USCMA 167, 15 CMR 167, and United States v. Craig, 2 USCMA 650, 10 CMR 148.

We have carefully examined the record, and we find no uncorrected error which prejudices the accused. The decision of the board of review is affirmed.

Judge LATIMER concurs.

Judge BROSMAN concurs in the result.