UNITED STATES, Appellee

v.

JOHN T. LEE, Sergeant, U. S. Army, Appellant

4 USCMA 571, 16 CMR 145

No. 4764

Decided July 23, 1954

LT COL James C. Hamilton, U. S. Army, for Appellant.
LT COL William R. Ward, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of premeditated murder and sentenced to death. Intermediate appellate tribunals have affirmed the conviction and sentence, and the case is now before this Court on mandatory review.

The accused was the mess sergeant of a field artillery battalion stationed at Neu Ulm, Germany. Sergeant Stanley R. Wade was a cook in the same mess. For about eight months friction existed between the accused and Sergeant Wade in the performance of their official duties and in their private affairs. On June 22, 1953, the accused appeared

before a board of officers which was inquiring into his fitness to retain his then grade of Sergeant First Class. Wade, among others, was a witness against him. Shortly afterward, Sergeant Wade went to Vilseck, Germany, on battalion maneuvers. The accused remained in the permanent area.

On July 8, in accordance with the recommendation of the board of officers, the accused was reduced one grade. A copy of the special order was sent to the accused through the regular message center. However, there is some evidence from which it may be inferred that the accused did not actually learn of his reduction in rank until about 7:15 a.m. on July 14. That same morning Sergeant Wade returned from the field maneuvers. At about 9:30 a.m., Sergeant Wade entered the mess hall. The accused saw him, and immediately left by a side door. In a pretrial statement which was admitted in evidence, the accused said that he left the mess hall "with the intentions of getting a carbine and ammunition . . . to shoot Sgt Wade." The accused approached a Private Pyles and offered to clean his carbine for him. Pyles refused the offer. Thereupon the accused accosted Corporal Dunbar, who had returned from the maneuvers and was preparing to take his equipment to his billet. The accused volunteered to help Dunbar with that task. The offer was accepted and the accused took Dunbar's carbine and blankets. According to both Pyles and Dunbar, the accused did not appear to be nervous or excited.

Dunbar's carbine was not loaded. In his pretrial statement, the accused said that as he took the weapon, he also "picked up a magazine with live ammunition from the floor of the track [tracked vehicle]." Instead of going to Dunbar's quarters, the accused returned to the mess hall. It was then about 10:00 a.m.

In the mess hall, Sergeant Wade was standing at a table between two other mess personnel; all were busy with the preparation of the noon meal. Their backs were toward the south entrance. Suddenly, a shot sounded, and Wade slumped to the floor. The others turned around and saw the accused about four feet away; he was holding a smoking carbine at "low port" arms. The accused started out of the mess hall. As he did so, he bumped into a Sergeant Williams, who asked him what had happened. The accused replied, "They can have my stripes now."

About an hour after the shooting, a medical officer pronounced Wade dead. He determined that death was caused by a gunshot wound in the head. At the trial, over defense objection, the medical officer used two photographs of the decedent to trace the path of the bullet; these photographs were taken after Wade died and showed his face covered with blood.

At about 4:50 p.m. on the day of the shooting, the accused was interrogated by two agents of the Criminal Investigation Division. He was warned of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. No threats or other means of coercion were used and no promises were made to him. The accused made a statement which was reduced to writing and was read and signed by him. In it, he recounted his difficulties with the deceased, who "has been agitating me for the last year." He concluded his statement by saying he "felt that by Sgt Wade causing me to loose [sic] one stripe, it was worth his life. . . . As soon as I was reduced I planned on how and what I was going to do when I saw Sgt Wade which resulted in my shooting him with Cpl Dunbar's carbine."

Considerable psychiatric testimony was admitted in evidence. Dr. Hans J. Rauch, Chief of the Heidelberg Psychiatric and Neurological Clinic and Professor of Psychiatry and Neurology at the University of Heidelberg, testified for the accused. He stated that he had examined the accused on July 29 and 30, and again on September 3, 1953. In all, he interviewed and tested the accused for approximately twelve hours. The tests he administered consisted of intelligence tests and a Rorschach test. From his interviews and tests, Dr. Rauch concluded that the accused is a "psychiatrically inhibited person" who normally suppresses his emotions. He

**573**

found the accused to be "of good intelligence, but . . . very much limited concerning his interests," with the dominant interest his service and rank in the army, which he regarded as a "confirmation of his own value." After the board proceedings, the accused developed a "state of interior tension," and when actually reduced in grade, he thought "that his life was now destroyed." He then became subject "to the influence of an extraordinary interior tension which called for a solution." In that condition, the accused's consciousness was "limited or narrowed" and his action was only emotional. Medically, the accused's condition is described as a "temporary mental derangement" based on the individual's own emotions.

In Dr. Rauch's opinion, at the time of the offense, the accused could distinguish right from wrong, but "his ability was reduced." It was also the doctor's opinion that at the time of the shooting, the accused could not adhere to the right; nor was he capable of forming the degree of intent required for the offense charged. Dr. Rauch believed that the accused possessed sufficient mental capacity, at the time of the trial, to understand the nature of the proceedings against him, and intelligently to cooperate in his defense.

Dr. Rauch admitted he found no signs that accused was suffering from psychoneuroses, and he would not characterize the accused's act as an "irresistible impulse." It was his opinion that, apart from his conduct on the morning of the offense, the accused was not suffering from any mental disease, defect, or derangement.

Two army doctors testified for the prosecution. These were Lieutenant Colonel R. L. Hack, Chief of the Department of Nervous and Mental Diseases, Fifth General Hospital, and a diplomate of the American Board of Psychiatry and Neurology, and First Lieutenant Max Forman, a psychiatrist with the Neuropsychiatric Service, Fifth General Hospital. Both doctors examined the accused at the hospital on July 20. They interviewed him for approximately one hour and forty minutes. After the interview various tests were administered to the accused; these included a Wechsler-Bellevue, Bender-Gestalt draw-a-person test, and a Rorschach test.

Colonel Hack found that at the time of the incident, the accused was under "considerable emotional strain." However, this strain was only that of a "moral weakness," and not the result of any mental deficiency, defect, or disease. Dr. Forman concluded that the accused had an IQ of 111, which placed him in the bright-normal intelligence grouping, but he possessed an "immature personality" and he did things "to bolster up his picture of himself." If something occurred that could be interpreted as belittling, the accused would be roused to "great fury and anger," and according to his "own sense of ethics, . . . he was entitled to revenge." In regard to the shooting of Sergeant Wade, he believed that the accused "knew that he was doing wrong . . . [and] his own statement is a [sic] nature of convincing himself he was justified."

Both Colonel Hack and Lt. Forman were of the opinion that the accused was able to distinguish right from wrong, and that he could adhere to the right. They were also of the opinion that the accused possessed sufficient mental capacity, at the time of the trial, to understand the nature of the proceeding against him and intelligently to cooperate in his own defense. Colonel Hack had formed the specific opinion that the accused had mental capacity, at the time of the offense, to formulate the premeditation charged. Each doctor acknowledged that he was aware of syphilitic tests which had been performed upon the accused, but neither believed that the positive reactions of the tests affected, in any way, the accused's mentality.

At the close of the case, counsel made their respective arguments. Defense counsel made no objection to trial counsel's argument. However, it is now alleged that his remarks were inflammatory and prejudicial. As far as they appear material to that claim, we have set out parts of the closing argument. Trial counsel described the shooting as

the "killing [of] an unsuspecting human being in the most cowardly manner." He characterized it as "a cold-blooded murder." In the course of his argument, he agreed with a remark made by defense counsel in his opening argument, and continued with the statement that, "All we can give to Sgt Lee is another chance; another chance to sin no more or to kill again, if some hapless victim should displease him." He referred to the defense efforts to "make out Sgt Lee [as] just a crazy, mixed-up kid of thirty-five, sort of, say, impulsive fellow—otherwise a nice chap who has his own private philosophy of who should live and who should die."

Rebutting the closing argument of the defense, trial counsel charged the accused with having convened a board in which he was not only the convening authority, judge, and jury, but, "In fact, he was the 'lord high executioner.'" He closed his rebuttal with the statement that, "To command respect criminal law must not fly in the face of common sense. He did it, didn't he? Then let him pay for it."

The law officer instructed the court that the specification constituted "a mere accusation" and was not itself evidence of guilt. He outlined to the court the elements of the offense, defined premeditation, and expressly told it that the "mere fact of killing with a deadly weapon does not raise an inference or presumption of premeditation and design." He also instructed the court on the elements of unpremeditated murder as a lesser included offense. He referred to voluntary manslaughter as a lesser included offense to murder, but he told the court that he was not going to instruct on the elements of that offense, since it appeared to him it was not raised. He further gave the court detailed instructions on the issue of sanity and the burden of proof as to it. In addition, he specifically advised the court that if it had a reasonable doubt the accused's mental state was such that he was incapable of entertaining the degree of intent or premeditation the law requires, it could not convict him of the offense charged.

Our first problem relates to the sufficiency of the evidence to support two essential findings: (1) that the accused was legally sane at the time of the commission of the offense, and (2) that the state of his mentality was such as to permit him to formulate a premeditated design to kill. See: United States v. Higgins, 4 USCMA 143, 15 CMR 143. Appellate defense counsel relies very heavily on Dr. Rauch's testimony that the accused could not adhere to the right, and that in his extreme state of interior tension he could not "formulate any clear or premeditated intent." This testimony is directly contradicted by that of Dr. Hack and Dr. Forman. It is also contradicted by the accused's pretrial statement in which he said that, after he learned of his reduction in grade, "he planned on how and what he was going to do" when next he saw the victim. Further evidence of the accused's mental responsibility and his capacity to premeditate is found in the circumstances under which he obtained the weapon from Dunbar and the manner in which he used it. Considering the record as a whole, there is clearly substantial evidence to support the finding of the court that the accused was legally sane and that he had a premeditated design to kill.

We turn now to an examination of certain actions by the law officer which are claimed to be erroneous and prejudicial to the substantial rights of the accused. The first of these relates to the admission in evidence of two photographs of the victim's blood-covered head. These photographs were used by the doctor who determined the cause of death for the purpose of tracing the points of the bullet's entry and exit. When the photographs were presented, the prosecution stated that they were intended to corroborate prosecution testimony relating to the position in which the accused held the carbine when he shot Wade. Defense counsel objected to the admission of the photographs on the ground that they were inflammatory and unnecessary to establish any facts in the case; he offered to stipulate to those facts which the

photographs were intended to corroborate. This stipulation was rejected by trial counsel.

In discussing the use of post-death photographs of a homicide victim in United States v. Bartholomew, 1 USCMA 307, 3 CMR 41, we said:

". . . The prosecution should, of course, refrain from offering any sort of evidence for an inflammatory purpose. This is elementary. However, if, as here, the item of proof is admissible for a legitimate purpose, the fact that it also may possibly tend in this undesirable direction is, in and of itself, no ground for reversal."

Out of an abundance of caution, trial counsel might perhaps have accepted the defense offer to stipulate, but he was not bound to do so. Trial counsel has a right to offer whatever evidence he thinks best suited to help the court-martial understand the testimony. Of course, he may not exceed the bounds of propriety. See United States v. Johnson, 3 USCMA 447, 13 CMR 3. However, the purposes for which the photographs were offered were both justifiable and proper, and, consequently, the law officer did not abuse his discretion in admitting them in evidence.

The second claim of error is based upon the law officer's denial of a defense request that he instruct on voluntary manslaughter as a lesser included offense. In United States v. Ginn, 1 USCMA 453, 4 CMR 45, we pointed out that ordinarily voluntary manslaughter is a homicide resulting from "a provoked and sudden affray." There is no evidence here of any such conditions. The accused was not engaged in any altercation with the victim at the time of the shooting; in fact, he had not even seen him for almost two weeks, and he did not speak to him when he saw him in the mess hall. Moreover, we cannot regard the difficulties which the accused had with the decedent, as recited in his pretrial statement, as constituting such provocation as would "excite uncontrollable passion in the mind of a reasonable man." Manual for Courts-Martial, United States, 1951, paragraph 198a, page 354. Therefore, we must conclude that the evidence does not reasonably raise the issue of voluntary manslaughter as a lesser included offense. The law officer was correct in refusing to instruct on that offense. United States v. Black, 3 USCMA 57, 11 CMR 57; United States v. Ginn, supra.

Finally, it is contended that trial counsel's remarks throughout the trial, and comments in his closing argument, were so highly inflammatory and calculated to prejudice the members of the court against the accused, that the accused was denied a fair trial. To support this claim reference is made to a number of pages in the record, but no attempt has been made to demarcate the objectionable parts of the closing argument. However, in the statement of facts, we set out the remarks which appellate defense counsel undoubtedly had in mind. After careful examination of the record, and of the closing argument, we are convinced that trial counsel did not overstep the bounds of propriety and fairness. See: United States v. Ransom, 4 USCMA 195, 15 CMR 195.

The findings of guilty are amply supported by the evidence. We find no errors prejudicial to any substantial right of the accused. The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.