UNITED STATES, Appellee

v.

SHERMAN F. GRAVITT, Airman Second Class,
U. S. Air Force, Appellant

5 USCMA 249, 17 CMR 249

No. 4889

Decided December 3, 1954

Erwin L. Pincus, ESQ., COL A. W. Tolen, USAF, and MAJ John J. Ensley, USAF, for Appellant.

LT COL Harold Anderson, USAF, LT COL Emanuel Lewis, USAF, and MAJ William G. Carrow, III, USAF, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This is a death case which is before us on mandatory review under Article 67(b)(1) of the Uniform Code of Military Justice, 50 USC § 654.

In addition to a charge of premeditated murder, the accused was tried on three specifications of assault with intent to kill and one alleging the theft of a carbine. He was convicted on all charges. Intermediate appellate authorities have affirmed the findings of guilty and the death sentence.

About 1:00 a.m. on July 28, 1953, Lieutenant B. Geller, the military police duty officer, was walking along a darkened street in the Peri-Ku area in the village of New Oroku, Okinawa. He had a .45 pistol in his hand. Accompanying him was Jiro Toguchi, a ci-vilian policeman. They were investigating a shooting. As they walked along, the beam of Toguchi's torch fell upon a taxicab. A man, carrying a carbine, got out of the cab. According to Toguchi, he walked toward them. Lt. Geller called to him, "Hey, soldier, come on." For reply, the man fired at them. Lt. Geller shot back. Again the man fired. This time Lt. Geller fell to the ground. Having no gun himself, Toguchi turned and ran. A few minutes later he returned. Geller was dead. There was a bullet through his head.

There is no doubt that the accused killed Lt. Geller. In two pretrial oral statements, which were admitted in evidence without objection, and in his sworn testimony at the trial, the accused's account of his activities estab-

252

lishes his connection with the death of the lieutenant. However, his version of the encounter is directly opposed to Toguchi's. He maintains that as he was sitting in the taxi, he saw a civilian policeman motion to him to come forward. As he got out of the taxi and walked toward him, the policeman started to run. He stopped, and was about to turn around when two shots were fired at him from the side. Instantaneously, he returned the fire. He shot twice. There being no further shooting, he waited about five minutes, then walked over to the place from which the shots had come. He found a fallen figure, with a pistol in its hand. He took the pistol, but made no effort to ascertain if the fallen man was alive or dead.

The accused admitted his participation in each of the other events which resulted in the filing of charges against him. In fact, on the larceny charge he entered a plea of guilty to wrongful appropriation; he also pleaded guilty to assault with intent to inflict grievous bodily harm on one of the three charges of assault with intent to murder. However, the accused's version of these events and the picture developed by the Government's witnesses are, to put it mildly, susceptible of different interpretations.

Military curfew in New Oroku was 11:00 p.m. At about 11:30 p.m. the accused was accosted by a military policeman and an air policeman who were on joint patrol. Earlier, he had escorted some Okinawan girls from a company party to their home in the village, and had remained for a drink. Purportedly, he heard the military policeman say that he was not going to give him "a break." An argument developed. Its nature is typified by the following excerpt from the accused's testimony:

". . . Then he again asked for my pass and I told him I was not going to give it to him. In the meantime I put my hands in my pocket and the AP on duty told me to get my hands out of my pockets and I asked why. He said we don't talk to an MP like that—you stand at attention and I asked when did that start. He said when you are talking to an MP you stand at attention and I asked when did that start so the MP again asked for my pass. I took it out, it was in my bill-fold. He wanted the pass and billfold and all the contents. I refused to give it to him."

Eventually, the accused was taken in the patrol jeep to the Naha Air Base where his organization was located. At the base entrance, the argument was resumed. In his words, the accused "invited him [the MP] on the side where we could have a fight about it." Both policemen and the guard at the gate testified to a further remark by the accused. The air policeman said that he heard the accused say, "He was going to get himself a bunch of MP's and AP's"; the military policeman testified that the accused said, "I am going to kill me some MP's and AP's"; the guard's version was that the accused said he "would get the MP." The accused denied making any such statement.

On leaving the gate, the accused proceeded to the orderly room to sign in. Entering that office, he noticed a carbine. Four such weapons had, in fact, been put there by persons coming off guard duty, in accordance with the squadron practice. The accused took one of these weapons. He then went to his barracks. A barracks-mate observed him taking some carbine shells from his field pack. The witness inquired whether there was any trouble. He was informed by the accused that it was "none of his business." Armed with the carbine and ammunition, the accused went to the Navy area on the base. There, he appropriated a jeep and drove off the base without stopping at the gate. He was recognized by the guard.

The accused drove back to the village. He met a group of Okinawans in front of the Seaman's Cafe. One of the group was Kinjo Shintaro, the proprietor of the Cafe. Shintaro and the accused were known to each other, but they had not met for about seven months. According to Shintaro's testimony, the accused approached, pointed his rifle at him, and said, "I kill, I kill." He asked

Shintaro if the mamasan was home. Receiving an affirmative reply, he ordered Shintaro to enter. Inside, the accused repeated his threat to kill. Shintaro turned and ran. As he reached the door, the accused shot him. The bullet hit Shintaro in the right shoulder, but he continued running.

In his own testimony, the accused said that Shintaro asked him into the cafe. When they had entered, he questioned Shintaro as to why he had killed a certain girl. He told Shintaro that "somebody ought to kick his brains out so that he could 'patai' like Kilko did." Kilko was a girl who had worked for Shintaro. She was "just a friend" of the accused. Suddenly Shintaro struck at him with a chair and, with the second swing, hit him in the shoulder. Shintaro ran toward the door, and the accused shot him.

Shintaro went to report the shooting to the Peri-Ku police. In the meantime, the accused remained in the general area of the cafe. According to his testimony, he hailed a taxi. He informed the driver that he was going to the base, but first he wanted some sake. The driver left on foot. He quickly returned to advise the accused that there was a military policeman or civilian policeman in the village. The accused insisted on his request, and the driver again left. The accused remained in the taxi. Then a civilian policeman approached, and motioned to him to come forward. He got out of the taxi, and there immediately began the exchange of gunfire which resulted in the death of Lt. Geller.

The gunfight between Lt. Geller and the accused was heard by Sergeant Hale and Corporals Frazier and Warren, three military policemen engaged in the investigation with Geller. With their weapons in their hands, they hurried to the area. They were approximately 20 to 25 feet apart with Hale in the lead. En route, Frazier turned up an alley. As Hale and Warren moved along, the accused entered the same street from an alley. He was between Hale and Warren. Warren saw the carbine in the accused's left hand. He called out, "Drop your gun, drop it." In-

254

stead, the accused pumped three shots at him with a pistol held in his right hand. Warren was hit in the left arm and hand. He thought that he fired one shot as a "sort of reflex action after getting hit." He fell to the ground. The accused came up to him. As Warren started to rise he was hit on the head with "a pretty hard object." Meanwhile, Hale had heard Warren's shout, and saw the shooting. As he ran toward Warren, he fired at the accused. The accused shot at him. Once more, Hale fired. This time the accused stumbled, as though he were hit, but he continued to shoot at Hale. They exchanged shots until Hale ran out of ammunition. The accused then disappeared in the darkness.

At the trial, the accused acknowledged the encounter with Hale and Warren, but, again, he denied the role of aggressor. According to his version, he heard someone call "Halt" and he did so. Given an order to advance, he came forward. He saw a military policeman holding a .45 pistol in his hand. He "ran back toward the darkness of the house," and the military policeman fired at him. He returned the fire. When Warren fell, he went over to see "if anything was wrong with him." Warren reached up for him. He pushed him down, kicked the .45 out of his hand, and picked it up. At that point, someone shot at him and hit him in the leg.

Shortly after the encounter with Warren, the accused was discovered in the area of a power plant located on the base. He was surrounded by armed men. Lieutenant Colonel Russell, Commander of the local military police detachment, called upon him to surrender. The accused responded by firing his pistol toward the Colonel's position. Hale, who was in the group surrounding the accused, opened fire with a sub-machine gun. The accused fell to the ground; however, he was apparently unharmed, except for the previous wound in his leg. He was taken into custody and brought to an army hospital. Although conceding the occurrence, the accused maintains that the only thing he heard was someone say, "that's the man who killed Lt. Gel-

ler." He thereupon tried to shoot himself. He turned the .45 toward his head and pulled the trigger.

About six hours after his apprehension, the accused was questioned at the hospital by Criminal Investigation Division agents. After full warning of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, and affirmative indications by him that he understood those rights, the accused made two oral statements. Although there are some inconsistencies, these statements are in substantial agreement with his testimony at the trial.

The general court-martial which tried the accused was convened by the Commander, 20th Air Force. It was composed entirely of Air Force personnel. By order of the convening authority, the place of trial was changed from Headquarters, 20th Air Force Base, to Headquarters, Ryukyu Command, which is an army installation. At the trial, defense counsel moved that the court "adjourn and reconvene at Naha or Kadena Air Base." The motion was based on the accused's belief that an army area was "hostile territory," inasmuch as he was charged with the murder of, and assault upon, army personnel. Trial counsel opposed the motion. He argued that the convening authority had expressly directed the court to meet in the designated place. He attributed the designation to the fact that a large number of the witnesses were army personnel, and it would facilitate the progress of the trial to have the court convened in the area in which they were stationed. The motion was denied, but before the law officer's ruling the following discussion took place:

"LO: Do you have any other grounds for your motion? You fully stated your grounds for the purpose of your motion?

"DC: I believe I have, Colonel. I want to reiterate the accused is unhappy here; he feels the Army is hostile; he feels he is in a gold fish bowl in front of the Army where he's been accused of these assaults and purported murder of Army people.

"LO: I am sympathetic with your position Captain but I cannot see that that would serve as a basis for your motion. Unless you have some legal authority to substantiate your position, you have . . .

"DC: No, we feel our basis for our motion is just as valid as our convening here and we'll rest on your decision.

"LO: Your motion is denied."

In due course, counsel made their closing arguments. Trial counsel completed his initial remarks without incident. However, defense counsel was interrupted by the law officer. The colloquy between them is as follows:

"LO: Will you try to limit your argument. You previously intimated it would take you about one-half hour —you are now over one hour and fifteen minutes. I suggest you . . .

"DC: I will close in about ten minutes.

"LO: I suggest you give some thought to the matter."

After the interruption, defense counsel made some additional remarks and concluded his argument. Later, he was asked if he had anything further to offer, and he gave a negative reply.

Following counsel's final arguments, the law officer instructed the court on the applicable law. He stated the elements of the offenses in the order in which they were numbered. Thus, larceny was discussed first, then murder, and, finally, the three aggravated assaults. The instructions on the murder charge included the following statement on premeditation:

". . . The killing of a human being, without justification or excuse, is an unlawful killing and constitutes premeditated murder when it is committed by one who has a premeditated design to kill. A murder is not premediated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill shall have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it

is immaterial how soon afterwards it is put into execution."

Also included, were a delineation of the elements of unpremeditated murder as a lesser included offense and a statement of the law of self-defense. The instructions on the assault charges defined their elements and those of assault with intent to inflict grievous bodily harm as a lesser included offense, but they made no mention of those of assault with intent to commit voluntary manslaughter. At this point, the law officer referred to his previous instructions on self-defense; he directed the court to consider them in their deliberations on the assault charges, along with some further remarks on the subject, which were made at that time.

Additionally, the court was instructed on the nature and effect of circumstantial evidence, the testimony of an expert witness, and character evidence. It was provided with instructions on the presumption of innocence and the burden of proof. And it was specifically cautioned to disregard any comment or statement by the law officer in the course of the trial which may have seemed to indicate an opinion as to the guilt or innocence of the accused. Defense counsel took no exception to any of the instructions, and requested no special instructions, although specifically asked by the law officer if he had any further requests for instructions.

Our first problem is to determine whether the law officer properly denied the accused's motion to change the place of trial. The accused agrees with the Government's contention that a court-martial may be convened without regard to geographic boundaries, but he argues that the law officer incorrectly assumed he had no legal authority to entertain the defense motion. This argument rests upon the accused's interpretation of the law officer's statement that he was "sympathetic" with the defense position. It is argued that, long before the trial, an army board of review had held that a motion for a change of venue was unknown in the military; consequently, the law officer must have "felt that he had no legal

authority" to consider the motion. See United States v. Johns, 66 BR 169. Significantly, no mention was made of this board of review opinion in the argument on the motion. But assuming it was known to the law officer, a member of the Air Force, we find nothing in his comments to warrant a conclusion that he believed he had no legal power to consider the motion. On the contrary, the only reasonable construction of his remarks is that he was denying the motion on the merits. He plainly indicated he believed the reason advanced by the accused was insubstantial. It is equally plain he was willing to grant the motion if the accused could show good legal reason for his doing so. Therefore, we find no error. However, still remaining is the question whether the accused's predicate for the motion requires us to find the law officer abused his discretion in refusing to change the place of trial.

A motion for a change of venue is not specifically referred to in the Manual for Courts-Martial, United States, 1951. See paragraphs 67–69, pages 96–107. However, we need not consider whether this omission, or the fact that the jurisdiction of a court-martial is conceded to be "geographically universal," makes the motion "unknown as such in military law." See United States v. Johns, supra, page 184. Unquestionably, an accused is entitled to a fair trial. Hence, if he can demonstrate that the court would be adversely influenced by a general atmosphere of hostility or partiality against him, existing at the place of trial, he would be entitled to be tried in some other place. Substance, not form, determines the nature of the relief sought. Consequently, regardless of technical description, the law officer is bound to consider the accused's motion as one for appropriate relief. Here, the record shows that he did so. But did the accused make a sufficient showing of hostility to warrant a change in situs?

In United States v. Vigneault, 3 USCMA 247, 12 CMR 3, it was asserted by the accused that he was deprived of a fair trial by the surrounding atmosphere of hostility and partiality.

No motion for a change of place of trial was made, but we clearly indicated in our opinion that a motion for appropriate relief based upon that ground is proper. See also: United States v. Hagelberger, 3 USCMA 259, 266, 12 CMR 15. We also pointed out that the motion must be supported by facts. In this case, the only fact of hostility advanced by the accused was that the major offenses were committed against army personnel. However, no evidence of any action or declaration of hostility by army personnel was presented. Nevertheless, in his appellate brief the accused argues that "The record would not reflect the feeling of tension, the expressions on the faces of the spectators, and other factors that could well have caused considerable impact on the minds of the court."

Our examination of the record discloses no suggestion of influence by the spectators. Defense counsel made no effort to exclude them from the courtroom, and not once during the entire trial did he indicate that their conduct or appearance, or the conduct and appearance of the court personnel, was in any way other than proper. In the Vigneault case, we rejected a similar argument of hostility which was based upon "symptoms of partiality." Here, not even the symptoms were present. Therefore, we conclude that the law officer correctly denied the accused's motion to change the place of trial.

The accused's second broad claim of error relates to the law officer's interruption of defense counsel's closing argument. It is asserted that the interruption, in effect, advised the court that the law officer believed there was no merit in the accused's case, and that his counsel was "merely wasting the court's time"; in short, that the interruption "demolished" the entire defense. Although we agree many judges would hesitate to break into defense counsel's argument, we cannot say the law officer acted improperly.

Unquestionably, closing argument is an important part of the defense case. United States v. Sizemore, 2 USCMA 572, 10 CMR 70. The Manual for Courts-Martial specifically provides that counsel should be accorded reasonable latitude in his argument. Ibid, paragraph 72b, page 111. In a capital case, he should be given even greater latitude. There should be no nice balancing of the court's time against the life of the accused. No life should be measured by the minute hand of the clock. On the other hand, however, the procedure at the trial is, and necessarily must be, within the control and discretion of the law officer. United States v. Jackson, 3 USCMA 646, 14 CMR 64. In the exercise of his sound discretion, he may restrict the closing arguments to reasonable limits. What is reasonable depends, of course, upon the facts of each case.

It appears here that defense counsel submitted an estimate of time required for argument. It is apparent, too, that he substantially exceeded that estimate. In a case of this kind, perhaps the law officer should have been a little more patient, but we cannot say he abused his discretion in reminding defense counsel of his original estimate. Neither can we say that by so doing he "demolished" the argument for the defense. The plain purpose of the law officer's remarks was to call defense counsel's attention to the length of his argument. This can hardly be construed as expressing an unfavorable opinion of the defense case. However, even if so construed, we cannot conclude that they prejudiced the accused. In United States v. Andis, 2 USCMA 364, 8 CMR 164, we pointed out that a law officer may express his opinion as to the guilt of the accused provided he clearly instructs the court that his opinion is not controlling and that the court alone, can decide the question of the accused's guilt or innocence. That cautionary instruction was given here. We cannot say the law officer's interruption improperly or adversely affected the deliberations of the court.

Two errors are alleged in connection with the murder charge. The first challenges the sufficiency of the evidence to establish premeditation; the second disputes the legal correctness of the law officer's instructions on premeditation.

Premeditation is a question of fact for the court. United States v. Goodman, 1 USCMA 170, 2 ▮▮ CMR 76. It may be inferred from the circumstances. Here, the accused was shown to have had an argument with two service policemen in which ▮▮ he threatened to "get" or to "kill" "some" military policemen. Almost immediately thereafter he stole a carbine and obtained ammunition for it. Then, he procured a vehicle, drove off the base without stopping at the guard gate, and proceeded to the village. Shortly after his arrival he shot a civilian. A few minutes later, he was informed that there were military or civilian police in the area. He then saw and was seen by a civilian policeman. In his own testimony, he denied that he saw Lt. Geller in the company of this policeman. But, according to a prosecution witness, the lieutenant was about three feet in front of him. The accused got out of the taxi and moved toward them. Then he fired the fatal shots. In this sequence of events there is no element of sudden surprise or impulsive reaction. Cf. Bullock v. United States, 122 F2d 213 (CA DC Cir 1941). Instead, there is a definite interval between the time the accused admits he saw the civilian policeman and the time he fired. On this evidence, we cannot say the court was not legally justified in finding that the homicide was premeditated. United States v. Ransom, 4 USCMA 195, 15 CMR 195.

Turning to the second claim of error in the instructions on premeditation, the accused contends that ▮▮ the law officer improperly injected into the case the doctrine of transfer of intent. He argues that the doctrine is limited to a situation in which the accused's actions are directed against a particular person, but inadvertently cause the death of a bystander. See: United States v. Sechler, 3 USCMA 363, 12 CMR 119. His reasoning is as follows: By defining premeditated murder in terms of "a specific intent to kill someone" the law officer was, in effect, instructing on the doctrine of transfer of intent. This was error, because the facts did not raise the issue. The error was prejudicial because under this instruction the court might have convicted the accused of the premeditated murder of Lt. Geller in the "mistaken belief" that it need only find that "the accused intended to kill the military policeman with whom he had previously had trouble."

The disputed statement is a verbatim quotation from paragraph 197d of the Manual for Courts-Martial. As an abstract statement of law it is undoubtedly correct. See United States v. Sechler, supra. The question, however, is whether, within the factual pattern of this case, the ambiguous word "someone" misled the court. We find no reasonable basis for misunderstanding.

Both the accused and the Government are agreed that the principle of transfer of intent is inapplicable to the facts of this case. The agreement is compatible with the evidence. Arguendo, it is also agreed that, under certain conditions, the controversial statement may erroneously inject the principle into a homicide case, to the prejudice of the accused. See: United States v. Galan [CM 358820], 9 CMR 322. Disagreement arises over whether conditions of prejudice are present here. From our examination of the record we conclude that accused was not harmed by the law officer's use of the indefinite word, "someone."

The circumstances surrounding the shooting of Lt. Geller show a premeditated design to kill him. True, the accused had threatened to "kill" or to "get" "some" air policemen or military policemen. However, this threat related to a class of persons, and Lt. Geller was a member of that class. Consequently, if the court considered the threat as evidence of premeditation, it must have regarded it as relating directly to the person actually killed. On that basis, we cannot see how the court could logically conclude it need not find a specific intent to kill Geller, if it found an intent to kill the particular policeman with whom the accused had quarreled. Cf. United States v. Galan, supra, page 329.

**258**

The accused's final assignment of error concerns the failure of the law officer to instruct on the ments of assault with intent to commit voluntary manslaughter, as a lesser included offense to the charge of assaulting Shintaro, with intent to murder, Unless the evidence raises that offense as a reasonable alternative, the law officer did not err in the omission. United States v. Short, 4 USCMA 437, 16 CMR 11.

Voluntary manslaughter is a homicide committed in the "heat of sudden passion caused by adequate provocation." Manual, supra, paragraph 198a, page 353. Not every act of provocation is sufficient to justify the killing. It must be such as would excite uncontrollable passion in the mind of a reasonable man. No such provocation is shown by the evidence in this case. The accused was not threatened in any way. On the contrary, whatever threats there were emanated from him. He was the only one who was armed. The girl who was the subject of his conversation with Shintaro was "just a friend," and the incident which appears to have resulted in her death was clearly long past. In any event, the conversation did not seem to engender any emotional tension in the accused. Giving maximum credit to the accused's testimony, it only appears that he fell off the chair in which he was sitting, when Shintaro struck at him and hit him in the shoulder. No attempt was made to follow up this assault. Instead, Shintaro turned and tried to run away. He had reached the door, when the accused shot him in the back. It is, therefore, quite apparent that the blow which Shintaro struck, if in fact it was delivered, was so slight as to give the accused no pain, or give him cause for alarm. We are unable to say that a reasonable person would have been so emotionally excited by these circumstances as to cause him to shoot to kill. United States v. Lee, 4 USCMA 571, 16 CMR 145. Hence, we find no merit in this claim of error.

We have reviewed the record with considerable care, and we find no error which prejudiced the accused in any of his substantial rights. We note that there was no issue of intoxication. In fact, the accused expressly denied that he was drunk. Also there is no question of the accused's sanity. The allied papers disclose that, before the trial, he was examined by a board of medical officers. Their findings excluded the possibility of a lack of mental responsibility at the time of the offenses or a lack of mental capacity to cooperate in his defense at the time of trial.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.