John E. DAY, Jr., Appellant,

v.

Colonel James W. DAVIS, Commandant, U. S. Disciplinary Barracks, Fort Leavenworth, Kansas, Appellee.

No. 5344.

United States Court of Appeals Tenth Circuit.

June 21, 1956.

Rehearing Denied July 9, 1956.

Certiorari Denied Oct. 22, 1956.

See 77 S.Ct. 104.

Homer Davis, Leavenworth, Kan., for appellant.

James W. Booth, Lt. Col., JAGC, Department of the Army, Washington, D. C. (William C. Farmer, U. S. Atty., Topeka, Kan., Selby S. Soward, Asst. U. S. Atty., Topeka, Kan., and Cecil L. Forinash, Lt. Col., JAGC, Department of the Army, Washington, D. C., were with him on the brief), for appellee.

Before BRATTON, Chief Judge, PHILLIPS, Circuit Judge, and ROGERS, District Judge.

PHILLIPS, Circuit Judge.

John E. Day, Jr., is in the custody of Colonel James W. Davis, Commandant, U. S. Disciplinary Barracks, at Fort Leavenworth, Kansas, under a court-martial sentence of death. He filed his application for a writ of habeas corpus in the United States District Court for the District of Kansas. Davis filed an answer. After a full hearing, the court entered an order discharging the writ of habeas corpus theretofore issued and remanding Day to the custody of Davis. This is an appeal from that order.

The facts disclosed in the records of the court-martial proceedings are these:

Day was a soldier in the United States Army, stationed in Korea. On the night of December 22–23, 1950, Lee Hak Chun, his wife, Kim Chung Hi, and their three children were in a basement room of the "VIP billets" in the Eighth Army Officers' Building in Seoul, Korea, awaiting transportation to Taegu because the Chinese Communists were then advancing on Seoul. Several other Koreans were in an adjoining room. About midnight, Day came into the room where Lee and his family were waiting, sat down beside Kim and put out the lights. Day then turned on the lights and seized Kim by her throat. A third person intervened and succeeded in taking Kim from Day. Day then struck Lee in the mouth. Day then left the room, but soon returned with an interpreter. He was then clad only in shorts and an undershirt and was carrying a gun (a carbine). The interpreter stated that Day wanted Kim "conceded" to him and told Lee if he did not send the woman upstairs, Day would kill all of them. Day then directed all the people in the basement room to line up. The interpreter told Lee to step out of line and when Lee did so, Day fired two shots into Lee's body, in the vicinity of Lee's heart. Day then seized Kim by the neck and chest and took her outside, where he continued to make advances toward her. When she screamed, Day struck her head with his carbine five times and then took her baby from her back and threw it on the front seat of a truck. At about one o'clock on December 23, 1950, CID Agent Foster went to the "VIP billets," where he found Lee lying on the floor on his back. Foster, who had had four years experience as an undertaker, examined the body of Lee, found no pulse, respiration, or body heat and determined that Lee was dead. On December 25, 1950, a Korean policeman also examined Lee's body, determined that he was dead, and directed his burial.

At the time of the commission of the crime, Seoul was being evacuated because of the Chinese Communists' offensive. Because of the military situation, it was not possible to prepare charges against Day until May 13, 1951. On that date, charges were filed and Day was advised of the charges. The charges were referred for pre-trial investigation, but because of the difficulty in locating the witnesses, it was not possible to complete the investigation until early August, 1951. On August 13, 1951, the original charges were withdrawn because of certain deficiencies, one of which being that the facts did not warrant the charge alleging the murder of the baby. New charges were prepared on August 23, 1951. The new charges were investigated on August 31, 1951, and were referred for trial on September 22, 1951. On the latter date, Day was placed in confinement.

Day signed a written confession on December 24, 1950. The trial commenced on October 1, 1951, more than a week after service of the charges and more than three months after Day was apprised of the charges and furnished counsel for the pretrial investigation. Defense counsel had frequent consultations with Day before the trial and were given ample time to prepare the defense. While formal orders appointing Colonel Abbott as defense counsel for Day had not yet been issued, he began the preparation of the defense on September 9, 1951. There is nothing in the record to indicate that all

available defenses were not fully presented and urged at the court-martial trial. Neither Day nor his counsel asked for a continuance.

The charges came on for trial before a general court-martial. Day pleaded not guilty. The evidence adduced clearly established the facts stated above, with respect to the offense.

A written statement made by a soldier who came upon Day and Kim when they were outside the "VIP billets" was admitted in evidence over the objection of counsel for Day. The soldier was placed on the witness stand by the prosecution and when he appeared reluctant to testify and asserted that he could not remember some of the facts and circumstances surrounding the incident, trial counsel sought to refresh his memory by showing him a statement he had made the morning after the shooting. When he testified it only slightly refreshed his memory, trial counsel offered the memorandum in evidence. Upon objection being interposed, the Law Officer interrogated the witness as to whether he remembered the facts independent of his written statement. The witness replied that he knew the statement was accurate and correct at the time he made it, that he could not remember all the details, and that he could remember no more than he had testified to.

At the court-martial trial, the Law Officer advised the court, in part, as follows:

"LO: The Court is advised that the elements of the offenses charged are as follows: a. As to Charge I:

"(1) That the accused unlawfully killed a certain person named by certain means, as alleged;

"(2) That the victim is dead;

"(3) That death resulted from an injury received by the victim;

"(4) That such injury resulted from an act of the accused;

"(5) That death occurred within a year and a day of such act;

"(6) That such killing was with malice aforethought; and

"(7) That the killing was premeditated.

"The court is referred to paragraph 179a, pages 230–232, Manual for Courts-Martial, 1949, for a discussion of the offense of murder and the meaning of the terms 'malice aforethought' and 'premeditation'. Among the lesser included offenses of premeditated murder are unpremeditated murder, voluntary and involuntary manslaughter, attempt to commit murder and certain forms of assault.

"b. The elements of the offense charged in the specification to Charge II are as follows:

"(1) That the accused assaulted a certain person with a certain dangerous weapon; as alleged; and

"(2) That the weapon was used in a manner likely to produce death or great bodily harm.

"The court is referred to paragraph 180l at page 247, Manual for Courts-Martial 1949, for a discussion of the offense of assault with intent to do bodily harm with a dangerous weapon.

\*　　\*　　\*　　\*　　\*　　\*

"The court is further referred to paragraph 154, sub paragraph (2), Manual for Courts-Martial, 1951, for a discussion of voluntary drunkenness as affects intent. I quote:

" 'A temporary loss of reason which accompanies and is a part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; but such drunkenness may be considered as affecting mental capacity to entertain a specific intent, or to premeditate a design to kill, when either matter is a necessary element of the offense.

" 'Evidence of drunkenness should be carefully scrutinized, as drunkenness is easily simulated or may have been resorted to for the purpose of stimulating the nerves to the point of committing the act.'

"The court is further advised:

"First, that the accused must be presumed to be innocent until his guilt is established by legal and competent evidence beyond reasonable doubt;

"Second, that in the case being considered, if there is a reasonable doubt as to the guilt of the accused, the doubt shall be resolved in favor of the accused and he shall be acquitted;

"Third, that if there is a reasonable doubt as to the degree of guilt, the finding must be in a lower degree as to which there is no reasonable doubt; and

"Fourth, that the burden of proof to establish the guilt of the accused beyond reasonable doubt is upon the Government.

"The rule as to reasonable doubt extends to every element of the offenses charged."

No exception was taken to the charge and no request for further instructions was made by defense counsel. While the Law Officer did not particularly define the terms "malice aforethought" and "premeditation," correct and accurate definitions of "premeditation" were read from recognized authorities, both by counsel for the prosecution and for the defense in the arguments. Counsel for the prosecution quoted as follows from Black's Law Dictionary:

"To think of an act beforehand; to contrive and design; to plot or lay plans for the execution of a purpose."

"The act of meditating in advance; the deliberation upon a contemplated act; plotting or contriving; a design formed to do something before it is done." (2 USC MA 423.)

. Defense counsel read from Paragraph 179a of the 1949 Manual, as follows:

. " * * * A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intention to kill someone and consideration of the act intended. Premeditation imports substantial, although brief, deliberation or design. For example, if in the course of an attempt to rape, the assailant deliberately chokes his victim until she suffocates, the deliberate nature of his act reveals premeditation, even though he may have entered upon the attempt intending no other harm. But if, in attempting to run from her assailant, the victim falls from a cliff and is killed, premeditation is lacking. * * *" (2 USCMA 423.)

He further read from Winthrop's Military Law and Precedents, Vols. I and II, 2d Ed., at page 293, as follows:

"In military cases, the fact of the drunkenness of the accused as indicating her state of mind at the time of the alleged offence, where it may be considered as properly affecting the issue to be tried or only the measure of punishment to be adjudged in the event of conviction, is in practice always admitted in evidence. And where a deliberate purpose or peculiar intent is necessary to constitute the offence, as in many cases of disobedience of orders in violation of Art. 21, desertion, mutiny, cowardice, or fraud in violation of Art. 60, the drunkenness, if clearly shown in evidence to have been such as to have incapacitated the party from entertaining such purpose or intent, will ordinarily properly be treated as constituting a legal defence to the specific act charged. * * *"

He further read from the same work, at p. 101:

" * * * If the existence of a specific intention is essential to the commission of a crime, the fact that an offender was drunk when he did such crime, should be taken into account by the jury in deciding whether he had that intention."

There was evidence that Day had been drinking heavily during the period immediately preceding the commission of the offenses. That was the sole basis for the issue of whether the murder was unpremeditated.

Day was found guilty of the offenses of premeditated murder and assault with a dangerous weapon, with intent to do bodily harm. He was sentenced to be put to death.

After a complete review by the Staff Judge Advocate, the sentence was approved by the convening authorities. The record of the court-martial trial was then forwarded to the Judge Advocate General of the Army for review by a Board of Review. On February 29, 1952, the Board of Review in the office of the Judge Advocate General of the Army, at Washington, D. C., rendered its decision. It considered (1) the fairness of the trial afforded Day; (2) the sufficiency of the evidence; (3) the sufficiency of the instructions of the Law Officer; and (4) the admissibility of a pre-trial statement of a witness. The Board of Review found that the findings of guilt and the sentence were correct in law and in fact and affirmed them. Day was represented at the Board of Review by both civilian counsel of his choice and qualified military counsel who presented a brief and argument in Day's behalf.

Pursuant to the provision of the Uniform Code of Military Justice, Art. 67 (b) (1), 50 U.S.C.A. § 654, the case was fully considered by the United States Court of Military Appeals. The Uniform Code requires that in all cases in which a court-martial sentence, as affirmed by a Board of Review, "extends to death" it shall be reviewed by the United States Court of Military Appeals.

Day was represented before the Court of Military Appeals by both civilian and military counsel, who submitted briefs.

In its decision of April 30, 1953, the Court of Military Appeals determined that the instructions of the Law Officer were sufficient to apprise the court-martial of the elements of the lesser offense of unpremeditated murder; that the evidence was legally sufficient to sustain the finding of premeditated murder; that Day received the effective assistance of counsel; and that the pre-trial statement of a witness was properly admitted in evidence. The Court of Military Appeals reduced the charge of assault with a dangerous weapon and affirmed the conviction of premeditated murder sentence. See 9 C.M.R. 46; 10 C.M.R. 960.

Pursuant to Article 71(a), Uniform Code of Military Justice, 50 U.S.C.A. § 658, the President on June 30, 1954, personally took his action approving the sentence to death and directing that it be carried into execution under the order of the Secretary of the Army.

In Hiatt v. Brown, 339 U.S. 103, at pages 110–111, 70 S.Ct. 495, at page 498, 94 L.Ed. 691, the court said:

"The Court of Appeals also concluded that certain errors committed by the military tribunal and reviewing authorities had deprived respondent of due process. We think the court was in error in extending its review, for the purpose of determining compliance with the due process clause, to such matters as the propositions of law set forth in the staff judge advocate's report, the sufficiency of the evidence to sustain respondent's conviction, the adequacy of the pretrial investigation, and the competence of the law member and defense counsel. Cf. Humphrey v. Smith, 1949, 336 U.S. 695, 69 S.Ct. 830 [93 L.Ed. 986]. It is well settled that 'by *habeas corpus* the civil courts exercise no supervisory or correcting power over the proceedings of a court-martial * * *. The single inquiry, the test, is juris-

diction.' In re Grimley, 1890, 137 U. S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636."

In Burns v. Wilson, 346 U.S. 137, at pages 139, 140 and 142, 73 S.Ct. 1045, at page 1047, 97 L.Ed. 1508, the court said:

"In this case, we are dealing with habeas corpus applicants who assert —rightly or wrongly—that they have been imprisoned and sentenced to death as a result of proceedings which denied them basic rights guaranteed by the Constitution. The federal civil courts have jurisdiction over such applications. * * *

"The statute which vests federal courts with jurisdiction over applications for habeas corpus from persons confined by the military courts is the same statute which vests them with jurisdiction over the applications of persons confined by the civil courts. But in military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civil cases. Hiatt v. Brown, 1950, 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691. Thus the law which governs a civil court in the exercise of its jurisdiction over military habeas corpus applications cannot simply be assimilated to the law which governs the exercise of that power in other instances. It is sui generis; it must be so, because of the peculiar relationship between the civil and military law.

"Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress.
\*   \*   \*   \*   \*   \*

"The military courts, like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights. In military habeas corpus cases, even more than in state habeas corpus cases, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings—of the fair determinations of the military tribunals after all military remedies have been exhausted. Congress has provided that these determinations are 'final' and 'binding' upon all courts. We have held before that this does not displace the civil courts' jurisdiction over an application for habeas corpus from the military prisoner. Gusik v. Schilder, 1950, 340 U.S. 128, 71 S. Ct. 149, 95 L.Ed. 146. But these provisions do mean that when a military decision has dealt fully and fairly with an allegation raised in that application, it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence. Whelchel v. McDonald, 1950, 340 U. S. 122, 71 S.Ct. 146, 95 L.Ed. 141."

■ It would seem, therefore, that our review here is limited to the question of whether or not Day was denied any basic right guaranteed by the Constitution.

*The Instructions Of The Law Officer.*

■ While the Law Officer should have instructed the Military Court on the meaning of the terms "malice aforethought" and "premeditation," we think the meaning of those terms was made perfectly clear by the quotation from Black's Law Dictionary and from the 1949 Manual read to the court by counsel for the prosecution and the defense, and by the Law Officer's reference to Paragraph 179(a), pages 230–232, Manual

for Courts-Martial, 1949, which was made available to the court. We think the charge of the Law Officer made it perfectly clear that the lesser offense of unpremeditated murder was included in the greater offense. As stated above, the basis of that issue was the alleged intoxication of Day. The Law Officer correctly and fully instructed as to the consideration to be given drunkenness as affecting mental capacity to premeditate or entertain a specific intent. Clearly, any deficiencies in the instructions are not of a character that presents a question open to review in habeas corpus.

### Effective Assistance Of Counsel.

■ The record discloses that Day had competent counsel, that counsel and Day had adequate time to prepare his defense, and that he was competently defended at the court-martial hearing, as well as in the subsequent review proceedings.

### Denial Of Speedy Trial.

■■ The right to a speedy trial is relative and must be determined in the light of all the circumstances in each case. Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950. In view of the military situation, the difficulty in securing witnesses, and of preparing the case, it cannot be said that Day was denied a speedy trial.

### The Admission Of The Memorandum In Evidence.

Paragraph 132, Manual for Courts-Martial, U. S. Army, 1949, in part reads:

"Memoranda may be used to supply facts once known but now forgotten or to refresh the memory. Memoranda are therefore of two classes: *First*, if the witness does not actually remember the facts or events but relies on the memorandum exclusively, as in the case of a witness using an old diary, then the witness must be able to state that the memorandum accurately represented his knowledge at the time of its making. * * * " (2 USCMA 425.)

■■ We agree with the Court of Military Appeals that the memorandum was properly admitted under Paragraph 132, Manual for Courts-Martial, U. S. Army, 1949. See United States v. Day, 2 USCMA 416–425. Moreover, it was merely cumulative evidence and if it was improperly admitted, at most it was error, and did not amount to the deprivation of any constitutional right guaranteed to Day. See Hiatt v. Brown, supra, 339 U.S. at page 110, 70 S.Ct. at page 498.

### Proof Of Corpus Delicti.

■■ We think there was competent and adequate proof of Lee's death and that it was caused by the shots fired into his body by Day. Moreover, on habeas corpus, the sufficiency of the evidence is not open to consideration. Hiatt v. Brown, supra, 339 U.S. at page 110, 70 S.Ct. at page 498.

### Alleged Failure To Call A Defense Witness Requested By Day.

■ At the hearing on the application for the writ of habeas corpus, Day testified that he requested the presence of a witness who was the only eyewitness to the crime. That statement was obviously false. The court-martial record discloses no request that such witness be produced. Even in the habeas corpus proceeding he wholly failed to show what such witness would testify to and the competency and materiality thereof. The contention is without merit.

We conclude that there was no denial of any constitutional right guaranteed to Day and the order appealed from is accordingly affirmed.